# Immigration Laws and Iranian Students

The President has authority under the Immigration and Nationality Act (INA) to limit or halt entry of Iranian nationals into the United States. He also has available to him under that statute a number of options by which he may regulate the conditions under which Iranian nationals already present in the country remain here or depart.

While the matter is not free from doubt, a reasonable reading of § 241(a)(7) of the INA would allow the Attorney General to take into account adverse foreign policy consequences in determining whether an alien's continued presence in the United States is prejudicial to the public interest, so as to render him or her deportable. However, it would be constitutionally inappropriate to identify members of the class of deportable persons in terms of their exercise of First Amendment rights.

Both the INA and the Constitution require that all persons be given a hearing and an opportunity for judicial review before being deported; however, neither the INA nor the Constitution would preclude the Attorney General or Congress from taking action directed solely at Iranian nationals, particularly in light of the serious national security and foreign policy interests at stake in the present crisis.

November 11, 1979

## MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This memorandum has been prepared by this Office and the Immigration and Naturalization Service (INS) General Counsel's office. It addresses the statutory provisions regarding entry and deportation of aliens as they pertain to Iranian nationals in the United States. It also examines the constitutional authority of Congress to enact legislation affecting Iranians residing in, or attempting to enter, this country. We conclude: (1) that the President presently possesses the authority to halt entry of Iranians into the United States; (2) that, while the matter is largely unprecedented and would raise nonfrivolous constitutional questions, the Attorney General may be able to promulgate standards which which would render deportable aliens whose presence in this country is prejudicial to the public interest and threatens the conduct of foreign affairs; (3) that the immigration laws and the Constitution require that all persons receive a hearing and judicial review before being deported; (4) that it is therefore unlikely that deportations could be effected with sufficient immediacy to have an impact on the present crisis in Tehran; (5) that the Attorney General could require all Iranian nonimmigrant students to demonstrate to the INS that they are "in status" (i.e., not deportable); (6) that regulations and statutes directed solely at Iranian

133

nationals would not violate the Constitution; and (7) that Congress has the authority to bar from entering and to deport Iranians.

## I. Population of Iranians

Iranian nationals in the United States may fall into four categories: (1) lawful permanent residents; (2) nonimmigrants; (3) parolees; and (4) aliens in the United States in violation of law.

Lawful permanent residents as defined in § 101(a)(20) of the Immigration and Nationality Act (INA or Act), 8 U.S.C. § 1101(a)(20), are aliens who have entered legally with immigrant visas or who have adjusted status while in the United States. A lawful permanent resident may remain in the United States indefinitely unless he commits misconduct covered by the deportation grounds set forth in § 241(a) of the Act, 8 U.S.C. § 1251(a).

Nonimmigrants are aliens within one of the twelve categories specified in § 101(a)(15) of the Act, 8 U.S.C. § 1101(a)(15). Generally, nonimmigrants are admitted for a particular purpose for a period of time, and under such conditions as the Attorney General may specify. § 214(a) of the INA, 8 U.S.C. § 1184(a). As of August 30, 1979 there were approximately 130,000 nonimmigrants from Iran in the United States. Of these, approximately 50,000 were nonimmigrant students as defined in § 101(a)(15) of the Act, 8 U.S.C. § 1101(a)(15).

A few Iranians may be in the United States as parolees who were allowed to enter temporarily for emergency reasons or for reasons deemed strictly in the public interest in accordance with the authority of the Attorney General under § 212(d)(5) of the Act, 8 U.S.C. § 1182(d)(5). Parolees are not considered to have been "admitted" to the United States and may be ordered to depart in an exclusion proceeding rather than a deportation proceeding.

Iranians who entered the country illegally or who have failed to maintain nonimmigrant status would be considered to be here in violation of law and would be *prima facie* deportable.

## II. Present Policy Toward Iranians

As a result of discussions between the State Department and the Justice Department following the fall of the Shah, INS has instituted a practice of granting "extended voluntary departure" to Iranians in the United States who may be out of status but who have expressed an unwillingness to return to Iran.[1] An alien granted extended voluntary departure is effectively permitted to stay in this country for an undetermined period of time. In addition, INS has deferred inspection of potentially excludable Iranians who claim political asylum. On the basis

---

[1] Iranians who have been convicted of crimes within the United States are not included in this policy.

134

of representations made by the State Department, the foregoing policies have been extended until June 1, 1980. Therefore, no Iranians are currently being deported from the United States against their will. Iranians who have been allowed to remain under these policies may be granted work authorization by the INS. At present, approximately 4,400 Iranians have been granted extended voluntary departure under the INS policy.

The original rationale for the policy of not enforcing departure was that the State Department was unsure about conditions in Iran following the fall of the Shah's government. By not taking a position with respect to involuntary return of Iranians, the State Department believed that it would have an opportunity to allow the situation in Iran to stabilize. In addition, claims for asylum were not determined because it was believed that statements regarding the likelihood of persecution in Iran may have had an adverse impact on the establishment of diplomatic relations with the new Iranian government.

It should also be noted that since January 1, 1979, all nonimmigrant students, including Iranians, have been eligible for "duration of status" under INS regulations. 8 C.F.R. § 214.2(f)(2) (1979). A student admitted for "duration of status" has no date specified for the expiration of his stay, but may remain for so long as he continues to be a full-time student in good standing at his school.

### III. Statutory Entry and Deportation Procedures

The INA provides elaborate procedures regarding entry and expulsion of aliens. As discussed below, several of the procedures are constitutionally required.

### A. Entry

Immigrants may be admitted into the United States if they possess a valid visa and are not otherwise excludable under § 212 of the INA, 8 U.S.C. § 1182. Section 212 lists 33 grounds for exclusion including insanity, drug addiction, pauperism, conviction of a crime involving moral turpitude, prostitution, false procurement of documentation or fraud, advocacy of anarchism and communism, or engaging in subversive activities. Nonimmigrants (*e.g.*, students, visitors, consular officials, foreign press) are admitted upon conditions and for such time as established by regulations by the Attorney General. § 214 of the INA, 8 U.S.C. § 1184.

Aliens seeking entry are inspected by immigration officers who may detain for further inquiry aliens "who may not appear . . . to be clearly and beyond a doubt entitled" to enter. § 235(b) of the INA, 8 U.S.C. § 1225(b). Such further inquiry occurs before a special inquiry officer (immigration judge), who is authorized to administer oaths, present and receive evidence, examine and cross-examine the alien or witnesses.

The alien is entitled to representation by counsel, and a complete record of the proceedings must be kept. §§ 235, 236, 292 of the INA, 8 U.S.C. §§ 1225, 1226, 1362. A decision excluding an alien may be appealed to the Board of Immigration Appeals, an independent quasi-judicial appellate body created by the Attorney General within the Department of Justice. 8 C.F.R. § 3.1. Board decisions in exclusion cases are reviewable in federal district court by habeas corpus.

The INA gives the President authority to "suspend the entry of all aliens or any class of aliens as immigrant or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate" upon a finding that entry "would be detrimental to the interests of the United States." § 212(f) of the INA, 8 U.S.C. § 1182(f). *See also* § 215(a)(1) of the INA, 8 U.S.C. § 1185(a)(1), as amended by Pub. L. No. 95–426, § 707, 92 Stat. 992 (1978).

## B. Deportation

The INA specifies 19 grounds for deportation of aliens. These include excludability at time of entry, conviction of a crime involving moral turpitude, advocacy of anarchism or communism, involvement in narcotic use or sale, and failure to maintain status or to comply with any condition of status. A deportable alien may be arrested upon a warrant of the Attorney General and held in custody or released on bond. Most deportation cases are initiated by the issuance of an order to show cause without the issuance of a warrant of arrest. At the ensuing deportation proceeding, conducted by a special inquiry officer, the alien is entitled to notice of the charges against him and of the time and place of the proceedings, to counsel, and to an opportunity to examine the evidence against him, present evidence in his own behalf and cross examine government witnesses. § 242 of the INA, 8 U.S.C. § 1252. The Government has the burden of proving deportability by clear, convincing, and unequivocal evidence. *Woodby* v. *INS,* 385 U.S. 276 (1966). The decision of the special inquiry officer is appealable to the Board of Immigration Appeals (BIA). Thereafter, judicial review is available in the court of appeals. § 106(a) of the Act, 8 U.S.C. § 1105 (a). Any alien held in custody under an order of deportation may also obtain judicial review through habeas corpus proceedings.

Most of the statutory provisions establishing hearing rights are constitutionally required. Since at least 1903, it has been recognized that the Due Process Clause of the Constitution applies to deportation proceedings. The *Japanese Immigrant Case,* 189 U.S. 86, 100–02 (1903). *Wong Yang Sung* v. *McGrath,* 339 U.S. 33, 49–51 (1950); *Kwong Hai Chew* v. *Colding,* 344 U.S. 590, 596–98 (1953). While Congress may have plenary authority to determine what classes of aliens must leave the United States, see below, deportable aliens may not be expelled without a

hearing. However, the provision of a right of appeal to the BIA and then to a federal court of appeals is not constitutionally required.

## C. Claims for Asylum

An alien in either exclusion or deportation proceedings may apply for asylum under INS regulation if he claims that he would be persecuted in his home country on the basis of race, religion, nationality, political opinions, or membership in a particular social group. 8 C.F.R. § 105 (1979). *See also* § 243(h) of the Act, 8 U.S.C. § 1253(h).

## IV. Grounds for Deportation and Exclusion Under Current Law

### A. Deportation

### 1. Lawful permanent resident aliens

Potential grounds for deportation of Iranian nationals presently in the United States are contained in two subsections of the INA. § 241(a)(4) and (7) of the INA, 8 U.S.C. § 1251(a)(4), (7). Section 241(a)(4) provides for the deportation of an alien who within 5 years after entry into the United States is convicted of a crime involving moral turpitude and is sentenced to a year or more in prison, or who is convicted of two crimes involving moral turpitude at any time after entry. This section would become operative, for example, if an Iranian national is convicted of committing a crime of violence in this country.

Section 241(a)(7), 8 U.S.C. § 1251(a)(7), provides for the deportation of an alien who has engaged in, or has the purpose of engaging in, activities described in § 212(a)(27) of the INA, 8 U.S.C. § 1182(a)(27). Section 212(a)(27) renders excludable any alien who the Attorney General has reason to believe seeks to enter the United States to engage in activities "which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States." The BIA has indicated, in dicta, that § 212(a)(27) "is broad enough to apply to others than subversives." *Matter of McDonald and Brewster*, 15 I&N Dec. 203, 205 (BIA 1975) (refusing to bar entry of persons carrying six marijuana cigarettes).[2] In that decision, the Board interpreted § 212(a)(27) to bar entry of persons who seek to engage in activities "inimicable to the internal security of the United States." *Id.* This Office has opined that this section would authorize the exclusion of six Rhodesian officials seeking to enter the United States to attend an agricultural convention; such entry was arguably deemed prejudicial to this nation's conduct of foreign affairs.

---

[2] *See In the Matter of M.,* 5 I&N Dec. 248 (BIA 1953) (refusing to bar entry of pacifist under § (a)(27)).

The scope of § 241(a)(7) is unclear. The leading treatise states that the section's "expansive and undefined power has not yet been invoked in any actual case." 1A Gordon & Rosenfield, Immigration Law and Procedure § 4.10c, at p. 4-93 (1979). A reasonable reading of the section, supported by its legislative history, would allow the Attorney General to take into account serious adverse foreign policy consequences in determining whether an alien's stay here is prejudicial to the public interest. Arguably, the Attorney General, perhaps upon advice from the Secretary of State, could determine that the presence of particular Iranian nationals severely injures the ability of this country to conduct foreign policy and threatens the maintenance of public order. The question is not free from doubt, however. Although this Office has opined heretofore that a broad reading of this statute is warranted, a substantial argument can be made that the "public interest" ground for deporting aliens was intended by Congress to give the Attorney General the power to deport only where the *conduct* of the alien is inimical to the public interest, rather than where his *presence* is thought prejudicial to the United States. If that reading of the statute is correct,[3] then the operation of this provision would require a determination of the type of activity that is cause for deportation. We have serious doubt whether the identification of the class of deportable persons could be made to turn on their exercise of First Amendment rights. Thus it would probably not be constitutionally appropriate to identify for deportation all those aliens who have participated in marches or demonstrations advocating the death or extradition of the Shah. *Cf. Harisiades* v. *Shaughnessy,* 342 U.S. 580, 592 (1952); *Dennis* v. *United States,* 341 U.S. 494, 502 (1951); *In the Matter of M., supra,* 5 I&N Dec. at 252. In short, while this section appears to give the Attorney General wide discretion in determining who may remain in the United States, it may be difficult to establish appropriate guidelines for its implementation.

## 2. Nonimmigrants

A nonimmigrant is subject to the same grounds of deportation under § 241(a)(4) and (7) as discussed above. In addition, a nonimmigrant who has remained beyond the length of his authorized stay may be deported as an overstay under § 241(a)(2) of the Act. However, as noted above, since January 1, 1979, all nonimmigrant students, including Iranians, have been admitted without a specified departure date and may remain as long as they continue to be students in good standing with their schools.

Examples of violations of status are working without authorization or performing other activities which are inherently inconsistent with the

---

[3] The Supreme Court has held that deportation provisions should be strictly construed. *Fong Haw Tan* v. *Phelan,* 333 U.S. 6, 10 (1948).

purpose for admission. However, the Board of Immigration Appeals has held that the test for students under § 241(a)(9) is whether the student's actions have meaningfully interrupted his studies. *Matter of Murat-Kahn* 14 I&N Dec. 465 (BIA 1973). This view has been endorsed by at least one appellate court. *Mashi* v. *INS,* 585 F.2d 1309 (5th Cir. 1978). Therefore, under current law the mere fact of arrest, even when followed by incarceration, does not automatically terminate a student's status.

3. Illegal entrants

An Iranian who entered the United States with an improper visa or without inspection would be deportable under §§ 241(a)(1) or (2).

*B. Exclusion*

Assuming that an Iranian seeking to enter the United States as an immigrant or a nonimmigrant had a proper visa, the relevant exclusion grounds would be §§ 212(a)(27) and (29), 8 U.S.C. § 1182(a)(27), (29). Section 212(a)(27) relates to aliens seeking to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States. This statutory language may have broad applicability as discussed above. Section 212(a)(29)(A) covers certain subversive activities and would be narrower in scope than § 212(a)(27).

### V. Executive Branch Options Under Present Statutory Authority

*A. Procedural Options*

1. Deportation

Nonimmigrants who are out of status are deportable. However, expeditious deportation of these persons may not presently be possible because of practical problems in identifying and locating them. Even if out-of-status persons are found, deportation proceedings, and subsequent BIA and judicial review, take on the average 1 year.[4] Since a deportation hearing is constitutionally required, and judicial review is provided by statute, it will be difficult to expedite proceedings. The BIA, which is created by regulation, could be eliminated, although such action could sacrifice uniformity of and control over deportation proceedings. The Attorney General could order increased investigation of the status of Iranian nonimmigrants and order the INS and BIA to assign priority to deportation proceedings against such aliens. It should

---

[4] The INS estimates that this involves two months at the INS district office, four months at the BIA, and six months in the court of appeals.

be recognized, however, that the Constitution and the INA prevent any summary deportation of Iranian nationals.

## 2. Entry

The INA gives the President broad authority to prescribe regulations conditioning or limiting entry of aliens, or any class of aliens. §§ 212(f), 215 of the INA, 8 U.S.C. §§ 1182(f), 1185. In addition to substantive limits on entry, discussed below, these provisions could authorize the President to establish special screening procedures for Iranian nationals to probe their reasons for entry and activities they plan to undertake in the United States. Such regulations must meet the test of "reasonableness"; presumably they could be justified if the President has information that Iranian terrorists or other persons intending to undertake violent action in this country are seeking entry.

### B. Substantive Options

#### 1. Entering aliens

a. *Change conditions of stay.* Under the authority of § 214(a), the INS published proposed regulations in August, 1979, which would make conviction for commission of a violent crime for which a sentence of one year or more could be imposed a violation of nonimmigrant status. In addition, the proposed regulations would make the provision of truthful information to the INS a condition of a nonimmigrant's stay in the United States. These regulations could be put into effect by some time in December, 1979. The INS expects that student groups will challenge these regulations on the ground that they add deportation grounds not provided by Congress.

b. *Presidential order under §§ 212(f) and 215(a).* Under §§ 212(f) and 215(a) of the Act, the President could declare that the admission of Iranians or certain classes of Iranians would be detrimental to the interests of the United States. Such a restriction would have to meet the test of reasonableness. Given the present uncertainty of the situation in Iran, the possible internal problems and violence which could be caused by Iranians demonstrating in the United States, and the difficulty in providing security for Iranians in the United States, such an order would probably be sustainable.

#### 2. Aliens in the United States

Under § 214 of the Act, the Attorney General could promulgate a regulation requiring all nonimmigrant students to appear at INS offices

140

and demonstrate they have maintained status.[5] The justification for such a regulation could be the necessity of securing an accurate count of nonimmigrant students in the United States and reexamining their period of stay in light of recent events. It may be difficult to justify the inclusion of nonimmigrant students other than Iranians. It should be noted that such action would be likely to overburden INS offices since there are several hundred thousand nonimmigrant students in the United States. Furthermore, locating and prosecuting persons who do not appear would be difficult and resource-consuming.

A more limited option would be to require only Iranian nonimmigrant students to appear at INS offices. Such a regulation could be justified upon information that substantial numbers of Iranian students are out of status. However, it would produce the same practical problems as the broader regulation (there are 50,000 nonimmigrant Iranian students).

## 3. Restrictions on departure

Under § 215 the President could restrict the departure of Iranians from the United States. However, this would seem to serve no useful purpose under the present circumstances.

### C. Equal Protection and Iranians

Several of the options outlined above single out Iranian nationals for special treatment—i.e., a bar on entry of Iranians, special screening procedures, requirements that Iranian nonimmigrants report to INS district offices. Arguably, new requirements based on national origin raise equal protection concerns.

It is not likely that a court would invalidate any of the proposed actions on the ground that they violated the Fifth Amendment.[6] While the States may not discriminate on the basis of alienage without demonstrating a compelling State interest, see Graham v. Richardson, 403 U.S. 365 (1971), and aliens in the United States are protected by the due process guarantee of the Fifth Amendment, Wong Yang Sung v. McGrath, 339 U.S. 33, 48–51 (1950), the federal government has plenary power to legislate on immigration matters. The Supreme Court has recognized that Congress may deny entry to, or require deportation of, aliens on grounds which would be impermissible if applied to American citizens. See The Chinese Exclusion Case, 130 U.S. 581 (1889); Galvan v. Press, 347 U.S. 522 (1954); Oliver v. INS, 517 F.2d 426, 428 (2d Cir.

---

[5] The "good cause" exception to the Administrative Procedure Act would have to be invoked to permit promulgation of the regulation without notice and comment. 5 U.S.C. § 553.

[6] Federal regulation of immigration is tested by the Fifth Amendment, which essentially incorporates the Fourteenth Amendment's guarantee of equal protection. See Hampton v. Mow Sun Wong, 426 U.S. 88, 99–101 (1976); Bolling v. Sharpe, 347 U.S. 497 (1954).

1975) (per curiam), *cert. denied,* 423 U.S. 1056 (1976). Congress' plenary power is based on the fact that entry and deportation classifications are "vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades* v. *Shaughnessy,* 342 U.S. at 588–89. *See Fong Yue Ting* v. *United States,* 149 U.S. 698 (1893); *Hitai* v. *INS,* 343 F.2d 466 (2d Cir.), *cert. denied,* 382 U.S. 816 (1965).

Some cases suggest in dicta that judicial review may be available to overturn classifications for which no rational basis can be found—*e.g.,* deportation on the grounds of religion. *Fiallo* v. *Bell,* 430 U.S. 787, 793, n.5 (1977); *Oliver* v. *INS, supra,* 517 F.2d at 428. But such review would clearly be limited to whether the lines drawn by Congress or the Executive branch are rational and not wholly arbitrary. *See Francis* v. *INS,* 532 F.2d 268 (2d Cir. 1976); *Noel* v. *Chapman,* 508 F.2d 1023, 1028 (2d Cir.), *cert. denied,* 423 U.S. 824 (1975).

Under this standard, we believe that the options outlined above would be constitutional. Given the present crisis, the activities of many Iranian nonimmigrant students, and the serious national security and foreign policy interests at stake, it is unlikely that a court would set aside otherwise legitimate policies directed solely at Iranian nationals.

Nor do we believe that any new regulations would be set aside if challenged as an instance of unconstitutional "selective enforcement." First, we assume that usual processing of aliens for entry and deportation would continue. Second, courts have traditionally recognized broad prosecutorial discretion in the enforcement of the law. While some cases have stated in dicta that a policy of prosecutions based on an unjustifiable and arbitrary standard such as race or religion may be unconstitutional, *e.g., Oyler* v. *Boles,* 368 U.S. 448, 456 (1962), we believe that heightened enforcement efforts aimed at out-of-status Iranian nonimmigrants would not be so arbitrary as to deny such persons due process. We believe that the President could make appropriate statements justifying such policies based on the international crisis, and upon a finding that many Iranian students (who constitute the largest foreign student group in the United States) may be out of status. *See United States* v. *Sacco,* 438 F.2d 264, 271 (9th Cir.), *cert. denied,* 400 U.S. 903 (1970).[7]

---

[7] While we know of no case on point, we believe that any prosecutions undertaken to stifle the exercise of First Amendment rights by Iranian students might face a serious constitutional challenge. *Cf. Lennon* v. *INS,* 527 F.2d 187, 195 (2d Cir. 1975).

## VI. The Power of Congress

The preceding sections have discussed the authority of the President and the Attorney General under existing statutes. This section addresses the constitutional limitations on congressional authority to regulate entry and deportation of aliens.

It is well-established that "over no conceivable subject is the legislative power of Congress more complete than it is over" the regulation of immigration. *Kleindienst* v. *Mandel,* 408 U.S. 753, 766 (1972) (quoting *Oceanic Navigation Co.* v. *Stranahan,* 214 U.S. 320, 339 (1909)). The Supreme Court has consistently upheld the plenary power of Congress to make rules for the admission and deportation of aliens as inherent in the concept of national sovereignty. *The Chinese Exclusion Cases, supra; the Japanese Immigrant Case, supra; Ekiu* v. *United States,* 142 U.S. 651, 659 (1892). In recent years the Supreme Court has steadfastly refused to reconsider its earlier cases or to develop substantive limits on Congress' power to exclude and deport. *See Fiallo* v. *Bell,* 430 U.S. at 792-93; *Kleindienst* v. *Mandel,* 408 U.S. at 766; *Galvan* v. *Press,* 347 U.S. at 531-32 ("[T]hat the formulation of . . . policies [regarding entry and deportation] is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government.")

The Supreme Court has also made clear that Congress may deport persons for prior conduct which did not render them deportable at the time they so acted. The retroactivity of such legislation does not violate the Due Process Clause or constitute an *ex post facto* law. *Lehmann* v. *Carson,* 353 U.S. 685 (1957); *Galvan* v. *Press, supra; Ng Fung Ho* v. *White,* 259 U.S. 276, 280 (1922). As stated most broadly by the Court:

> The basis for the deportation of presently undesirable aliens resident in the United States is not questioned and requires no reexamination. When legally admitted, they have come at the Nation's invitation, as visitors or permanent residents, to share with us the opportunities and satisfactions of our land. As such visitors and foreign nationals they are entitled in their persons and effects to the protection of our laws. So long, however, as aliens fail to obtain and maintain citizenship by naturalization, they remain subject to the plenary power of Congress to expel them under the sovereign right to determine what noncitizens shall be permitted to remain within our borders.
>
> Changes in world politics and in our internal economy bring legislative adjustments affecting the rights of various classes of aliens to admission and deportation . . . . Since "[i]t is thoroughly established that Congress has power to

order the deportation of aliens whose presence in the country it deems hurtful," the fact that petitioners, and respondent . . . , were made deportable after entry is immaterial. They are deported for what they are now, not for what they were. Otherwise, when an alien once legally became a denizen of this country he could not be deported for any reason of which he had not been forewarned at the time of entry. Mankind is not vouchsafed sufficient foresight to justify requiring a country to permit its continuous occupation in peace or war by legally admitted aliens, even though they never violate the laws in effect at their entry. The protection of citizenship is open to those who qualify for its privileges. The lack of a clause in the Constitution specifically empowering such action has never been held to render Congress impotent to deal as a sovereign with resident aliens.

*Carlson* v. *Landon,* 342 U.S. 534–37 (1952) (footnotes omitted) (quoting *Bugajewitz* v. *Adams,* 228 U.S. 585, 591 (1913)).

Thus, Congress possesses almost unlimited power in establishing substantive regulations defining categories of aliens who may enter and who must leave the United States. Congress clearly has the power to bar all Iranians from entering the United States and could order all Iranian nationals out of the country. Of course, such legislation raises serious policy issues: many Iranian nationals in this country may be loyal to the United States or the Shah and may be well-integrated members of American society with jobs and families. Furthermore, some Iranians may face persecution in Iran and thus would apply for asylum here.

Nor do we believe, as discussed above, that legislation directed solely at Iranians would offend the Fifth Amendment, as long as there was a rational basis for such legislation.[8]

Accordingly, Congress could constitutionally adopt, for example, legislation:

(1) barring entry of Iranians; and/or
(2) deporting all Iranian nonimmigrant students.

---

[8] [W]hether immigration laws have been crude and cruel, whether they may have reflected xenophobia in general or anti-Semitism or anti-Catholicism, the responsibility belongs to Congress. Courts do enforce the requirements imposed by Congress upon officials in administering immigration laws, *e.g., Kwock Jan Fat* v. *White,* 253 U.S. 454, and the requirement of Due Process may entail certain procedural observances. *E.g., Ng Fung Ho* v. *White,* 259 U.S. 276. But the underlying policies of what classes of aliens shall be allowed to enter and what classes of aliens shall be allowed to stay, are for Congress exclusively to determine even though such determination may be deemed to offend American traditions and may, as has been the case, jeopardize peace.

*Harisiades* v. *Shaughnessy,* 342 U.S. at 597 (Frankfurter, J., concurring).

It must be noted, however, that while Congress has broad substantive power to define categories of admissible and deportable persons, its power to eliminate *procedural* protections is substantially limited by the Due Process Clause of the Constitution. As discussed above, the Supreme Court held consistently since the turn of the century that aliens may not be deported without a prior hearing. Recent decisions enlarging due process rights probably guarantee an alien (1) adequate notice of the hearing, (2) the right to present evidence and cross-examine witnesses, (3) representation by counsel, and (4) an unbiased decisionmaker. And while Congress may eliminate or limit the scope of review of deportation proceedings in the courts of appeals, it is unlikely that it could deprive aliens of the right to file habeas corpus petitions asserting deprivations of due process and other constitutional rights. U.S. Const. art. I, § 9, cl. 2. *See* 2 Gordon and Rosenfield, *supra*, § 8.6a (1979). Thus, while Congress could order that all Iranian nonimmigration students leave the United States, it could not deprive such aliens of a hearing to demonstrate that they do not come within the proscribed category. *Japanese Immigration Case, supra.*

Congress may be able to expedite expulsion of deportable aliens, such as out-of-status students, by providing for additional immigration officers and judges who could help locate and process such persons. However, the requirement of a hearing and the availability of habeas corpus review would prohibit any summary proceedings and render unlikely, as a practical matter, any immediate gain in the speed of enforcement of the existing law.

## VII. Conclusion

There exists a rather broad range of actions that could be taken both by the Executive Branch and by the Congress in this area. Necessarily, however, any action would have to be carefully scrutinized based upon the facts in existence at the time of any proposed action and the strength of the national security and foreign affairs interests. Because of the sensitive and important First Amendment, equal protection and due process considerations likely to be implicated by any action taken by the government, and given the high likelihood of litigation, we urge that any proposal be given careful and thorough consideration.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*