UNITED STATES of America and Equal Employment Opportunity Commission,

v.

TRUCKING MANAGEMENT, INC., et al., North Penn Transfer, Inc., Appellant.

UNITED STATES of America and Equal Employment Opportunity Commission, Appellants,

v.

TRUCKING MANAGEMENT, INC., et al., Appellees.

Nos. 79–2102, 79–2103.

United States Court of Appeals, District of Columbia Circuit.

Argued 24 March 1981.

Decided 14 Aug. 1981.

David B. Marblestone, Atty., Dept. of Justice, Washington, D. C., of the bar of the Supreme Court of Illinois pro hac vice by special leave of Court, and Warren B. Duplinsky, Atty., Equal Employment Opportunity Commission, Washington, D. C., with whom Drew S. Days, III, Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty., Walter W. Barnett and David L. Rose, Attys., Dept. of Justice, Lutz Alexander Prager and Paul E. Mirengoff, Attys., Equal Employment Opportunity Commission, James D. Henry and Louis G. Ferrand, Jr., Attys., Dept. of Labor, LeRoy D. Clark, Gen. Counsel, Joseph T. Eddins, Associate Gen. Counsel, and Carin Ann Clauss, Sol. of Labor, Washington, D. C., were on the brief for United States of America, et al., appellants in No. 79–2103 and cross-appellees in No. 79–2102. Beatrice Rosenberg, Atty., Equal Employment Opportunity Commission, Washington, D. C., also entered an appearance for appellants in No. 79–2103.

Roland P. Wilder, Jr., Washington, D. C., with whom David Previant, Milwaukee, Wis., Wilma B. Liebman, and Robert M. Baptiste, Washington, D. C., were on the

brief for International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, appellee in Nos. 79–2102 and 79–2103.

Michael J. Gallagher, Washington, D. C., with whom R. F. Beagle and James L. Moeller, Washington, D. C., were on the brief for Arkansas-Best Freight Systems, Inc., et al., appellees in Nos. 79–2102 and 79–2103.

Harry A. Rissetto, Washington, D. C., with whom Charles P. O'Connor, William J. Curtin, and Susan S. Sauntry, Washington, D. C., were on the brief for Trucking Management, Inc., et al., appellee in Nos. 79–2102 and 79–2103.

Plato E. Papps, Washington, D. C., Alfred M. Klein, and Thomas J. Fineman, Los Angeles, Cal., entered appearances for International Ass'n. of Machinists and Aerospace Workers, AFL–CIO, appellee in Nos. 79–2102 and 79–2103.

Francis M. Gregory, Jr., Washington, D. C., with whom Marilyn L. Muench, Washington, D. C., was on the brief for North Penn Transfer, Inc., appellant in No. 79–2192.

Thomas G. Abrams, Andrea R. Waintroob, Robert E. Williams, and Douglas S. McDowell, Washington, D. C., were on the brief for Equal Employment Advisory Council, amicus curiae, urging affirmance in No. 79–2102.

Before SWYGERT,* Circuit Judge, United States Court of Appeals for the

Seventh Circuit, WILKEY and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

Appellants United States and Equal Employment Opportunity Commission (EEOC) first brought this suit in 1974, urging that a defendant class of trucking companies, two labor unions, and their collective bargaining representatives had engaged in hiring, assignment, and seniority practices unlawful under both Title VII of the Civil Rights Act of 1964 [1] and Executive Order No. 11,246. [2] By a partial consent decree filed with the complaint and approved by the district court, the parties jointly established a compensation procedure which purported to resolve all disputed issues save those concerning defendants' alleged discriminatory seniority practices. When this case first came before us on interlocutory appeal, we vacated the proposed compensation procedure and remanded to the district judge for immediate resolution of those seniority issues. [3]

In the four years intervening, two decisions have sharply narrowed the questions yet to be resolved. In *International Brotherhood of Teamsters v. United States (Teamsters)*, [4] decided just before our decision vacating and remanding, [5] the Supreme Court held that the precise seniority system challenged here had been adopted and maintained without discriminatory intent and thus constituted a "bona fide seniority system" expressly exempt from liability under section 703(h) of Title VII. [6] On remand

---

* Sitting by designation pursuant to 28 U.S.C. § 291(a).

1. 42 U.S.C. §§ 2000e to 2000e–17 (1976).

2. 3 C.F.R. 339 (1965), *reprinted in* 42 U.S.C. § 2000e app., at 1232 (1976) *and in* 42 U.S.C. § 2000e app., at 392 (Supp. III 1979) (as amended).

3. *United States v. Trucking Employers, Inc.*, 561 F.2d 313 (D.C.Cir.1977).

4. 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

5. *Teamsters* was decided 31 May 1977. *Trucking Employers* was decided 29 June 1977.

6. Section 703(h) of Title VII, codified at 42 U.S.C. § 2000e–2(h) (1976), provides in part:

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin . . . .

appellants argued to the district court that the challenged seniority system, even if expressly declared lawful under Title VII by *Teamsters*, nevertheless violated the contractual "affirmative action" obligations imposed on defendants by Executive Order No. 11,246.[7]

In the ruling being appealed to us today, the district judge dismissed *inter alia* those portions of appellants' complaint alleging violations of the Executive Order for failure to state a claim upon which relief can be granted.[8] The district judge framed the central question before him as whether Executive Order No. 11,246 can "make unlawful the negotiation and maintenance of the [very] seniority system found bona fide and lawful by the Supreme Court under Title VII of the 1964 Civil Rights Act."[9] Answering that question in the negative, the district judge cited, but did not rely upon, the Fifth Circuit's 1977 decision in *United States v. East Texas Motor Freight System, Inc.*,[10] a suit involving all of the plaintiffs and some of the defendants here.[11] In that case, the Fifth Circuit held that a bona fide seniority system found lawful under Title VII by virtue of section 703(h) may *not* be found unlawful under Executive Order No. 11,246. Because we find the Fifth Circuit's

decision persuasive, if not preclusive, on this issue, we affirm.

## I. BACKGROUND

Nationally active common carriers maintain a distinction between higher-paid intercity drivers who haul motor freight over long distances between company terminals ("over-the-road" or "line" drivers) and lower-paid intracity drivers who pick up and deliver goods only within the immediate vicinity of a particular company terminal ("city" drivers). Through bargaining agents, the national trucking companies and the Teamsters, which represents all truck drivers, have negotiated a comprehensive nationwide collective bargaining agreement with area supplements called the National Master Freight Agreement (NMFA). That agreement recognizes over-the-road drivers and city drivers as separate job classifications and bargaining units, providing for separate lines of job seniority for each. Accordingly, drivers are hired for one job or the other, and any driver transferring between classifications loses the accumulated seniority from his or her earlier job.

In the early 1970's the Government, first through the Department of Justice and later through the EEOC,[12] began to file com-

---

**7.** Title VII makes it unlawful for an employer or union to engage in discriminatory employment practices on the basis of race, color, religion, sex, or national origin. Section 703(h) of Title VII, however, exempts from liability "bona fide" seniority systems, even if they perpetuate *past* discrimination, so long as they were not framed with an *intent* to discriminate. Executive Order No. 11,246 not only requires a government contractor or any contractor working on a federally assisted construction project not to discriminate, it also requires him to take "affirmative action" to ensure the *absence* of discrimination in his employment program.

**8.** Memorandum Opinion (hereinafter Mem. Op.), *reprinted in* Appendix [App.] at 718a.

**9.** *Id.* at 18, *reprinted in* App. at 735a.

**10.** 564 F.2d 179 (5th Cir. 1977).

**11.** The original action was brought by the United States and the EEOC against East Texas Motor Freight, the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Teamsters) and the Union

and International Association of Machinists and Aerospace Workers (Machinists). However, the Machinists defaulted by filing no answer and were disregarded for purposes of the appeal. *Id.* at 181.

**12.** Initially only the Attorney General had authority under § 707 of Title VII to bring suit against private employers and unions to enforce provisions of that title. In 1974 the Attorney General's authority to enforce Title VII was transferred to the EEOC, which was then substituted as a plaintiff in all of the Attorney General's Title VII cases. 42 U.S.C. § 2000e–6(c), (d) (1976). In 1978, however, this function was transferred back to the Attorney General under the Executive Reorganization Plan. Exec. Order No. 12,068 (30 June 1978), *reprinted in* 42 U.S.C. § 2000e–6 app., at 402 (Supp. III 1979) (implementing Reorganization Plan No. 1 of 1978, § 5, *reprinted in* 42 U.S.C. § 2000e–4 app., at 398 (Supp. III 1979)). Only the Attorney General has the authority to enforce claims arising under the Executive Order.

plaints in various circuits charging the nationwide trucking companies, the unions representing their employees, and the bargaining agents for both sides with violations of Title VII and Executive Order 11,-246.[13] Generally speaking, the complaints alleged that separation of drivers into two classes for purposes of hiring, assignment, seniority, and transfer constituted an unlawful industry-wide "pattern or practice" of discrimination against those present and prospective black and Hispanic drivers seeking the better-paid line driver positions.[14]

Eight years ago the Government brought the suit on appeal here against eleven named companies, as representatives of a defendant class of more than 300 common carriers of general commodity freight employing over-the-road drivers (the Companies), Trucking Management, Inc. (TMI),[15] which represents most of the Companies for collective bargaining purposes, the Teamsters and their bargaining committee,[16] and the Machinists, which represents the shop employees of some of the defendant Companies.[17] The complaint charged that the Companies had violated legal obligations under both Title VII and Executive Order No. 11,246 by establishing and conducting the two-tiered seniority system. It further claimed that the unions had perpetuated the discriminatory effects of the Companies' practices by negotiating and consenting to the NMFA. As relief, the Government sought an injunction order permitting black and Hispanic employees to transfer between job classifications without loss of seniority.

In May 1977, while interlocutory appeal was being taken from the district court's initial ruling in this case,[18] the Supreme Court decided *Teamsters*, its second major decision regarding the lawfulness of seniority systems under section 703(h) of Title VII.[19] In *Teamsters* the Court held that seniority systems which perpetuate past discrimination are nevertheless exempt from attack under Title VII, so long as they are "bona fide" within the meaning of section 703(h) of that title.[20] Equally significant for our purposes, however, the Court explicitly held as a matter of fact that the NMFA, the seniority system challenged here,

> is entirely bona fide. It applies equally to all races and ethnic groups. To the extent that it "locks" employees into non-line-driver jobs, it does so for all. The city drivers ... who are discouraged

---

**13.** *See, e. g., International Bhd. of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *United States v. East Tex. Motor Freight Sys., Inc.*, 564 F.2d 179 (5th Cir. 1977).

**14.** Section 707(a) of Title VII, 42 U.S.C. § 2000e–6(a) (1976), permits the Government to bring a civil action to enforce Title VII rights so long as the alleged discrimination is not merely isolated, sporadic, and nonrepetitive.

**15.** TMI was originally known as Trucking Employers, Inc.

**16.** The Teamsters' bargaining committee is currently known as the Teamsters National Freight Industry Negotiating Committee.

**17.** The Government's complaint alleged that the transfer provisions of the collective bargaining agreements between the Machinists and the Companies perpetuated the effects of the Companies' discrimination.

**18.** *See* notes 3 & 4 *supra.*

**19.** In *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), the Court held that § 703(h) does not prevent remedial awards of constructive seniority for unlawful employment practices unrelated to the seniority system. In *Teamsters*, however, the Court delineated for the first time the circumstances under which a seniority system itself would be held liable under Title VII. *See* 431 U.S. at 347–56, 97 S.Ct. at 1860–65.

**20.** Writing for the majority, Justice Stewart acknowledged that the Teamsters' seniority system would have been unlawful under the rationale of *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), but for the § 703(h) exemption. 431 U.S. at 349, 97 S.Ct. at 1861. *Griggs* established that even facially neutral employment practices are condemned under Title VII if they have discriminatory effects. 401 U.S. at 432, 91 S.Ct. at 854. *Teamsters*, however, interpreted § 703(h) to give "bona fide" seniority systems immunity against Title VII attack even if they perpetuated *past* discrimination, so long as they were otherwise racially, sexually, and ethnically neutral. 431 U.S. at 352–55, 97 S.Ct. at 1863–64.

from transferring to line-driver jobs are not all Negroes or Spanish-surnamed Americans; to the contrary, the overwhelming majority are white. The placing of line drivers in a separate bargaining unit from other employees is rational, in accord with the industry practice, and consistent with National Labor Relation Board precedents. It is conceded that the seniority system did not have its genesis in racial discrimination, and that it was negotiated and has been maintained free from any illegal purpose.[21]

Shortly after *Teamsters*, this court remanded the interlocutory appeal, requiring that the district judge determine the scope of the employees' seniority rights.[22] At that time we specifically chose not to address any other issues raised by the parties.[23] Relying largely on *Teamsters*, defendants then proceeded to file a series of motions urging decertification of the defendant class, judgment on the pleadings, and summary judgment.[24]

Seven months after *Teamsters*, while remand proceedings continued in this case, the Fifth Circuit handed down its decision in *United States v. East Texas Motor Freight System, Inc.*,[25] a case arising out of facts remarkably similar to our own.[26] The United States and the EEOC had litigated a two-week nonjury trial against the Teamsters on the question whether "the seniority provisions of the collective bargaining agreements between the [Teamsters] and E[ast] T[exas] violated Title VII and the Executive Order because they perpetuated the effects of [past] discrimination."[27] As part of their relief, plaintiffs had requested an injunction granting a "seniority carryover" award to line drivers transferring to over-the-road slots under a pretrial consent decree.[28] In a judgment handed down prior to *Teamsters*, the district court had awarded partial "seniority relief" to the drivers, finding that the seniority system created a barrier to the movement of minorities to over-the-road jobs. At the urging of the United States, the Fifth Circuit considered whether the district court's award of seniority rights, now unsupportable under Title VII after *Teamsters*,[29] could nevertheless be sustained on the basis of Executive Order No. 11,246. Assuming *arguendo* that the Executive Order *authorized* the plaintiffs to bring an action against the union to award retroactive seniority relief to individual em-

---

21. 431 U.S. at 355–56, 97 S.Ct. at 1864–65.

22. The district judge had approved a partial consent decree negotiated between the parties, containing a compensation procedure with a provision for waiver of employees' backpay claims. In *Trucking Employers* we vacated and remanded, holding that court approval of the proposed compensation procedure would have to await judicial resolution of the seniority issues. Our reasoning was essentially that no employee could intelligently waive a backpay claim without knowing what he might receive in return, nor could an employee prospectively waive back pay without knowing whether or not the employer's conduct under the seniority system constituted an act of discrimination. *See United States v. Trucking Employers, Inc.*, 561 F.2d 313, 316–19 (D.C.Cir.1977).

23. *Id.* at 320.

24. *See* Mem. Op. at 1–2, *reprinted in* App. at 718a–19a.

25. 564 F.2d 179 (5th Cir. 1977).

26. In 1972 the Attorney General had filed a complaint under Title VII and Executive Order No. 11,246 against East Texas Motor Freight (a common carrier), the Teamsters, and the Machinists. As in this case, the Teamsters' local had negotiated a collective bargaining agreement with East Texas, approved by the union itself. That agreement authorized separate seniority systems for over-the-road and city drivers, with no provision for seniority carryover between the two classifications. By consent decree East Texas and the Government settled all issues except the validity of the collective bargaining agreement's seniority provisions. Those issues the parties left for resolution by trial between the United States and the Teamsters. *Id.* at 181.

27. *Id.*

28. The plaintiff also requested that an award of back pay be made against the union. *Id.*

29. On Title VII issues the court vacated the district court's orders and remanded for proceedings consistent with *Teamsters*. *Id.* at 183–84.

ployees,[30] the Fifth Circuit then turned to the precise question before us today: "whether a bona fide seniority system is lawful under Title VII (by virtue of Section 703(h) of Title VII) but unlawful under the Executive Order."[31] In particular, the court examined plaintiffs' claim that the Executive Order imposes obligations on government contractors "above and beyond" those imposed on employers by Title VII because the Executive Order contains no provision corresponding to section 703(h), Title VII's "bona fide seniority system" exemption.[32]

The Fifth Circuit noted first that the Government's Executive Order claim was "an argument never made until after the *Teamsters* decision."[33] It then rejected the argument:

> Congress has declared for a policy that a bona fide seniority system shall be lawful. The Executive may not, in defiance of such a policy, make unlawful—or penalize—a bona fide seniority system. This Court ... [recently] ... recognized that an order of the Executive has the force of law only "if it is not in conflict with an express statutory provision."... Section 703(h) of Title VII is such a provision. The authorities cited by plaintiffs, to whatever extent applicable, are before the *Teamsters* decision and are made obsolete by that decision.[34]

Turning to *Teamsters* itself, the court concluded that the Supreme Court had based that decision not on the specific language of Title VII but on the congressional intent and policy underlying it.[35] Noting that the Court had vacated and remanded in light of *Teamsters* a judgment in a seniority system case involving 42 U.S.C.

§ 1981 claims,[36] the Fifth Circuit concluded that the *Teamsters* Court did not intend the principles of its decision "to be limited to claims under Title VII."[37]

Defendants in this case subsequently argued before Chief District Judge Bryant that the *East Texas* holding collaterally estopped the Government's renewed challenge to the NMFA under the Executive Order. While eventually endorsing the position adopted by the Fifth Circuit, Judge Bryant chose not to apply collateral estoppel to bar plaintiffs from newly raising the Executive Order issue.[38] Reaching that issue afresh, Judge Bryant concluded as a matter of law that Executive Order No. 11,246 could not render unlawful a seniority system which the Supreme Court had expressly found lawful under Title VII.[39]

## II. ANALYSIS

### A. *Issue Preclusion*

At the threshold, we must examine whether the Fifth Circuit's resolution of the Executive Order issue was in fact binding upon the district court under the doctrine of collateral estoppel, or, stated in modern parlance, whether the issue of the seniority system's lawfulness under Executive Order No. 11,246 was precluded in the district court since the plaintiffs—the United States and the EEOC—had fully and fairly litigated the issue before the Fifth Circuit.

We find this a close question. The United States conceded at oral argument that the issue presented here is identical to the one argued to the Fifth Circuit, excepting only that the Government's presentation today discusses the legislative history of Title VII in greater detail. Thus, the very issue

---

30. *Id.* at 185.

31. *Id.*

32. *Id.*

33. *Id.*

34. *Id.* (citations omitted).

35. *Id.*

36. *Id.* (citing *Sabala v. Western Gillette, Inc.,* 516 F.2d 1251 (5th Cir. 1975), *vacated and*

*remanded,* 431 U.S. 951, 97 S.Ct. 2670, 53 L.Ed.2d 268 (1977), *on remand,* 559 F.2d 282 (5th Cir. 1977)).

37. 564 F.2d at 185.

38. Mem. Op. at 9–11, *reprinted in* App. at 726a–28a.

39. *Id.* at 11–18, *reprinted in* App. at 728a–35a.

we are now asked to decide was both actually litigated and actually decided by another circuit court against the same plaintiffs, after a full and fair opportunity for litigation, by a final, valid disposition. In such cases the Supreme Court has expressly endorsed the use of issue preclusion as a shield—even for defendants not present at the earlier action—as a valuable method of conserving scarce judicial resources.[40]

Judge Bryant chose not to apply collateral estoppel, however, because he found indications in the record that the *East Texas* plaintiffs had presented their claims in a procedural posture significantly different from the posture of this case.[41] Since the trial court may refuse to permit the defensive use of collateral estoppel when there is good reason to allow a party to relitigate an issue,[42] and since the court found "reasonable disagreement" as to whether today's issue was in fact properly preserved and pleaded in *East Texas*,[43] we are loath to find reversible error on this ground.

The closeness of the question does, however, suggest the prudence of carefully examining the reasoning by which the Fifth Circuit resolved today's issue in *East Texas.* Since we find the reasoning to be persuasive, further investigation of the numerous complex and troubling issues raised by counsel is both unwarranted and unnecessary.

B. *The Relationship Between Title VII and Executive Order No. 11,246*

The district judge read Title VII and its legislative history as reflecting "Congress' will to protect seniority rights even if it means blunting the attack on the effects of discrimination caused by inertia."[44] While "the Executive Order has the force and effect of law," Judge Bryant noted, "it is not a statute and must be enforced within the framework of Congress' legislative will."[45] To interpret the Executive Order as invalidating bona fide seniority systems protected by Title VII, he concluded, "would run afoul of the statutory construction of Title VII and legislative intent of Congress as pronounced by the Supreme Court, and as such would violate the doctrine of separation of powers and vitiate the holding of *Teamsters.*"[46]

The Government now argues on appeal that Judge Bryant's conclusion should be reversed for erroneous statutory construction.[47] Its core contention is that the district court, like the Fifth Circuit in *East Texas,* "did not accurately determine Congress' intent" in enacting section 703(h) of Title VII.[48] The "fundamental issue in the present case," as appellants see it, is not whether the President has inherent authority by Executive Order to override the expressed or implied will of Congress—indeed, appellants do not argue that issue.[49] The only controversy created here involves the question "whether Section 703(h) is intended to govern implementation of Executive Order 11246."[50] If Congress intended *only* to shield bona fide seniority systems from challenge *under Title VII,* appellants claim, their interpretation of the Executive Order would not conflict with the legislative will and hence would still carry the force of law.

---

40. *See, e. g., Blonder-Tongue Laboratories, Inc. v. University of Ill. Foundation,* 402 U.S. 313, 328–29, 91 S.Ct. 1434, 1442–43, 28 L.Ed.2d 788 (1971) (endorsing defensive use of collateral estoppel without mutuality). *See also Parklane Hosiery Co v. Shore,* 439 U.S. 322, 329, 99 S.Ct. 645, 650, 58 L.Ed.2d 552 (1979).

41. Mem. Op. at 9–11, *reprinted in* App. at 726a–28a.

42. The Restatement (Second) of Judgments § 68.1 (Tent. Draft No. 4, 1977), § 88 (Tent. Draft No. 3, 1976), enumerates a variety of circumstances in which a court may afford a party an opportunity to relitigate an issue.

43. Mem. Op. at 11, *reprinted in* App. at 728a.

44. *Id.* at 13, *reprinted in* App. at 730a.

45. *Id.* at 15, *reprinted in* App. at 732a.

46. *Id.* at 17, *reprinted in* App. at 734a.

47. Brief for Appellants at 12.

48. *Id. See also id.* at 19.

49. *Id.* at 19 ("There is no claim here of inherent presidential authority").

50. *Id.*

In support of their theory, appellants rely on two arguments, one based on the language of section 703(h) and one based on its legislative history. The argument made from language is easily dismissed. Appellants contend that section 703(h) provides only that bona fide seniority systems are lawful "[n]otwithstanding any other provision *of this title*," [51] thus allowing provisions of other titles, and a *fortiori*, executive orders carrying the force of law, to be invoked to challenge those systems. The *East Texas* court was careful to note that the *Teamsters* Court itself, by subsequent action in a case brought under 42 U.S.C. § 1981, had indicated the lawfulness of bona fide seniority systems under provisions of other titles.[52] That suggestion accords with a series of cases decided both before and after *Teamsters* uniformly holding that section 703(h)'s immunization of bona fide seniority systems clearly extends to suits brought under section 1981.[53] We agree that under those cases appellants' reading of the "[n]otwithstanding any other provision of this title" language is implausible. To us that language suggests Congress' simple, but unequivocal, intent to preserve the lawfulness of bona fide seniority systems *even after* the passage of Title VII.

With regard to section 703(h)'s legislative history, we again find the Fifth Circuit's observations in *East Texas* persuasive. That court noted frankly that until *Teamsters* the Government had never argued that the Executive Order invalidates seniority systems expressly found lawful under Title VII itself.[54] The reason why is apparent. Before *Teamsters* was decided, *Title VII itself*, as interpreted by lower courts, had provided the Government with a sufficient basis for challenging facially neutral seniority systems which, though adopted and maintained without discriminatory intent, nevertheless perpetuated some effects of past discrimination.[55]

Accordingly, before *Teamsters* the Government never had cause to construe Title VII's legislative history as expressing congressional approval of a more far-reaching *executive* power to remedy past discrimination perpetuated by bona fide seniority systems.[56] Only after *Teamsters* was decided did the EEOC adopt the position that Title VII's legislative history evinces congressional intent that, with respect to seniority systems, the reach of Title

---

**51.** *Id.* at 20. The current language of § 703(h) is "[n]otwithstanding any other provision of this *subchapter*, ..." 42 U.S.C. § 2000e–2(h) (1976) (emphasis added).

**52.** *See* 564 F.2d at 185.

**53.** *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157 (5th Cir. 1978), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979); *Johnson v. Ryder Truck Lines, Inc.*, 575 F.2d 471 (4th Cir. 1978), *cert. denied*, 440 U.S. 979, 99 S.Ct. 1785, 60 L.Ed.2d 239 (1979); *Patterson v. American Tobacco Co.*, 535 F.2d 257 (4th Cir.), *cert. denied*, 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976); *Chance v. Board of Examiners*, 534 F.2d 993 (2d Cir. 1976), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977); *Waters v. Wisconsin Steel Works of Int'l Harvester Co.*, 502 F.2d 1309 (7th Cir. 1974), *cert. denied*, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976); *Queen v. Dresser Indus.*, 21 Fair Empl.Prac.Cas. (BNA) 761 (D.Md. 1978).

**54.** *See* 564 F.2d at 185.

**55.** *See Teamsters*, 431 U.S. at 378–79 nn.2 & 3, 97 S.Ct. at 1876–77 nn.2 & 3 (Marshall, J., concurring in part and dissenting in part) (noting that courts of appeals had uniformly held contrary to ultimate *Teamsters* holding).

**56.** For this reason, we find the Government's citation of *Contractors Ass'n v. Secretary of Labor*, 442 F.2d 159 (3d Cir.), *cert. denied*, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971), particularly inapposite. That case involved a challenge to the goals for utilization of minorities under the Philadelphia Plan, an affirmative action plan promulgated pursuant to Executive Order No. 11,246. Not only was that case decided before *Teamsters* when no court or legislator had focused on any distinction between Title VII and the Executive Order, but it was based on the affirmative action obligations of the Executive Order which have only prospective application. Those obligations could not be applied here to provide retroactive seniority relief. Furthermore, because the court in *Contractors Ass'n* evaluated the seniority system discussed there under pre-*Teamsters* standards, there was no finding as here that the seniority systems at issue were protected by § 703(h).

VII and the Executive Order should not be coterminous.[57]

We find appellants' present efforts to reassess the legislative history strained and unconvincing. As originally enacted, Title VII made only one reference to the entire Executive Order program, and that was inserted into the legislative history without debate or commentary.[58] The legislative history of section 703(h), the section of Title VII explicitly concerned with seniority systems, made no mention of the Executive Order. At the same time, however, the legislative history of that section exhibited considerable congressional concern and struggle to preserve the vested seniority rights of workers without major curtailment of Title VII's overriding objective of eliminating employment discrimination based on race, sex, and national origin.[59]

The *Teamsters* Court read the legislative history of Title VII as revealing plain congressional intent to *protect seniority rights*, so long as those rights are preserved by a "bona fide" seniority system.[60] A fair reading of the same legislative history suggests that Congress simply did not consider, either in 1964 when it passed Title VII,[61] or in 1972 when it amended it,[62] whether the Executive could or should reach *beyond* Title VII to redress any discrimination which a facially neutral bona fide seniority system might perpetuate. The Government's construction of section 703(h) would require us

to conclude that Congress somehow intended to permit the Executive independently to modify or dismantle concededly bona fide seniority systems. We find it highly unlikely that Congress would have impliedly approved Executive interference with the same bona fide seniority systems it had deliberately immunized under section 703(h).

Although we think the legislative history clearly refutes the Government's argument, we note an additional consideration demonstrating that Congress did not intend to permit executive orders to override seniority systems that are exempt under section 703(h). Appellees here are subject to Executive Order No. 11,246 because they carry goods under Government bills of lading. Common carriers must accept all goods offered for shipment; given the vast volume of Government traffic, virtually all of them will carry some Government goods and thus be subject to this Executive Order. To read section 703(h) as placing no limit on the Executive Order's capacity to regulate bona fide seniority systems would permit the Executive to ignore section 703(h) completely and to redefine which common carrier seniority systems are lawful and which are not. Such a result would plainly violate the congressional prerogative to strike the balance between the national goals of preventing employment discrimination and preserving vested seniority rights.[63] We cannot

---

57. Only after *Teamsters* did the Office of Federal Contract Compliance Programs issue a policy clarification statement, taking the position that *Teamsters* does not apply when Executive Order No. 11,246 rather than Title VII is the basis for a challenge to a seniority system. *See* OFCCP Policy Clarification Statement No. 77–42/LEG (20 July 1977), *reprinted in* 2 Empl. Prac. Guide (CCH) ¶ 5031 (1977) ("our view of the *Teamsters* case is that it is a narrow decision based on the [§ 703(h)] exemption").

58. That provision relieved employers filing reports under Executive Order No. 11,246 from the requirement of filing additional reports pursuant to Title VII. *See* § 709(d) of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e–8(d) (1976).

59. *See Teamsters*, 431 U.S. at 350–54, 97 S.Ct. at 1861–1864 (discussing legislative battle).

60. *Id.*

61. *See* 110 Cong.Rec. 7213 (1964) (interpretive memorandum filed by Sen. Clark and Sen. Case), *discussed in* 431 U.S. at 350–52, 97 S.Ct. at 1861–1863.

62. Equal Employment Opportunity Act of 1972, Pub.L.No.92–261, 86 Stat. 103 (codified in scattered sections of 42 U.S.C. §§ 2000e to 2000e–17 (1976)).

63. *See generally* Brody, *Congress, the President, and Federal Equal Employment Policymaking: A Problem in Separation of Powers*, 60 B.U.L.Rev. 239 (1980).

presume, especially in the absence of any evidence to the contrary, that Congress intended this result.[64]

## III. CONCLUSION

For the reasons stated above, the district court's ruling dismissing the Government's Executive Order claims is hereby affirmed. Because the related rulings regarding decertification of the defendant class, modification of the consent decree, and dismissal of the Executive Order claims against the Machinists and four companies who did not sign the partial consent decree all stemmed directly from the dismissal of the Executive Order claims, they are also hereby affirmed. Finally, because decertification of the defendant class has now been affirmed, North Penn Transfer's appeal from its motion to be excluded from the defendant class is dismissed.

*So Ordered.*

---

**64.** An additional problem with the Government's construction is that it could actually work to the detriment of some minority drivers. Since the passage of Title VII blacks and Hispanics have accumulated seniority as over-the-road and city drivers. To abolish the separate seniority lists and order transfers with seniority carryover between the lists could result in some white city drivers with accumulated seniority from before 1965 gaining seniority over black and Hispanic over-the-road drivers hired *after* 1965. In such cases *neither* the goal of preserving vested seniority rights *nor* the goal of eliminating past discrimination against black and Hispanic drivers would be served by Executive action.