**Shirley Ann OLIVER, Petitioner,**

**v.**

**UNITED STATES DEPARTMENT OF JUSTICE, IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**No. 469, Docket 72–2304.**

United States Court of Appeals, Second Circuit.

Argued April 11, 1975.

Decided May 15, 1975.

Mary P. Maguire, Sp. Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., S. D. N. Y., and Lydia E. Morgan, Sp. Asst. U. S. Atty., of counsel), for respondent.

John B. Nolan, Hartford, Conn. (Wayne L. Slitt and Day, Berry & How-

ard, Hartford, Conn., of counsel), for petitioner.

Before FRIENDLY and OAKES, Circuit Judges, and LASKER, District Judge.*

PER CURIAM:

This is a case illustrating that, once the machinery of the law has been set in motion, administrative and judicial authorities may be powerless to stop it, however much they wish. Perhaps petitioner can obtain relief from another branch of the Government; to our regret we cannot grant it to her.

Petitioner Shirley Ann Oliver, a native and citizen of Canada, was born in Montreal on December 29, 1945. When ten years old, she was admitted into the United States for permanent residence; she has continuously resided in Connecticut since that time. She married an American citizen and had two children by him. After that marriage had terminated in divorce, she married another American citizen.

In 1969 Mrs. Oliver, who was a drug addict, was arrested on a charge of possession of narcotics in violation of Connecticut General Statutes § 19–481(a). She had been a passenger in an automobile in which heroin was found. She claims that she was unaware of the presence of narcotics but pleaded guilty on the advice of the public defender.[1] She was sentenced to a term of one to three

years, execution of which was suspended, and placed in the custody of the Connecticut Commissioner of Mental Health for a period of at least 90 days for in-patient treatment at Connecticut Valley Hospital, where she successfully underwent rehabilitation.

In November 1970 the INS issued an order requiring petitioner to show cause why she should not be deported pursuant to § 241(a)(11) of the Immigration and Nationality Act.[2] The Special Inquiry Officer found that she should be, the Board of Immigration Appeals affirmed, and this petition followed.

Petitioner's first claim, that she is not an "alien", runs as follows: Section 101(a)(3) defines an alien as one who is not a citizen or national of the United States. Section 101(a)(22) defines a national of the United States to be "(A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States." Petitioner claims that, because of having resided exclusively in the United States for twenty years since her early childhood, she "owes allegiance" to this country and is thus a national. However true that may be in a human sense, the concept of "owing allegiance" for purposes of nationality is not so easily satisfied or indeed understood. See Koessler, "Subject," "Citizen," "National," and "Permanent Allegiance," 56 Yale L.J. 58, 67–69 (1946). Suffice it to say that petitioner cannot be a "national" as that term is understood in our law.[3] Rather, Mrs. Ol-

---

\* Of the United States District Court for the Southern District of New York, sitting by designation.

1. She has made no effort to have her conviction vacated. Contrast Mestre Morera v. INS, 462 F.2d 1030 (1 Cir. 1972).

2. This provides, so far as here pertinent, for the deportation of any alien who "is, or hereafter at any time after entry has been, a narcotic drug addict, or who at any time has been convicted of a violation of, or a conspiracy to violate, any law or regulation relating to the illicit possession of or traffic in narcotic drugs or marijuana . . . ."

3. See Developments in the Law, Immigration and Naturalization, 66 Harv.L.Rev. 643, 703–04 (1953); 3 Gordon & Rosenfield, Immigration Law and Procedure § 11.3b, at 11–8, 11–9 to 11–10 (1975) (footnotes omitted):

The term nationals came into use in this country when the United States acquired territories outside its continental limits whose inhabitants were not at first given full political equality with citizens. Yet they were deemed to owe permanent allegiance to the United States and were entitled to our country's protection. The term national was used to include these noncitizens in the larger group of persons who belonged to the

iver owes allegiance to Canada; apparently because of neglect rather than deliberate intention, she has not chosen "to renounce and abjure absolutely and entirely all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty of whom or which the petitioner was before a subject or citizen," as § 337(a)(2) requires for naturalization. Chapter 1 of Title III indicates that, with a few exceptions not here pertinent, one can satisfy § 101(a)(22)(B) only at birth; thereafter the road lies through naturalization, which leads to becoming a citizen and not merely a "national".

■ A more appealing claim is that the special severity meted out for narcotics offenses offends the due process clause of the Fifth Amendment. Mrs. Oliver would not have been deportable if the offense here had been a crime involving moral turpitude, § 241(a)(4), because it was not committed within five years after entry and because, even if she had committed a serious crime that would otherwise lead to deportation under that section, § 241(b) would relieve her of its applicability if she could obtain a pardon or if the sentencing court, within 30 days of sentencing, had recommended to the Attorney General that she not be deported. But such relief for § 241(a)(11) deportees is expressly foreclosed by the last sentence of § 241(b), which Congress took pains to add four years after the Immigration and Nationality Act was adopted in the Narcotic Control Act of 1956, Pub.L.No.84–728, § 301(c), 70 Stat. 575 (1956).

While particularly drastic deportation sanctions with respect to aliens found guilty of participating in the importation of narcotics could readily be justified, we must confess difficulty in seeing the rationality of the broad sweep of § 241(a)(11), applying to mere addiction and even to the possession of marijuana, much of which is grown domestically, particularly as reinforced by the final sentence of § 241(b). If ordinary equal protection standards applied, the statute would seem to be both overinclusive, in respect of offenses (or even lack of offenses) such as those mentioned, and underinclusive in not enumerating, e.g., a murder committed more than five years after entry. But the Supreme Court has told us, in a decision where it clearly was under strong temptation to rule otherwise, that the validity of distinctions drawn by Congress with respect to deportability is not a proper subject for judicial concern. Galvan v. Press, 347 U.S. 522, 530–32, 74 S.Ct. 737, 98 L.Ed. 911 (1954). We have been pointed to no decision qualifying what was there decided. To be sure, there must be some limit, e.g., a provision for deportation on the basis of religion, but that has not been approached here.

■ Finally, petitioner's contentions that her deportation constitutes the infliction of double jeopardy and is a cruel and unusual punishment fail, among other reasons, under the principle so clear to judges, however difficult it may be for laymen to comprehend, that "[d]eportation, however severe its consequences, has been consistently classified as a civil rather than a criminal procedure." Harisiades v. Shaughnessy, 342 U.S. 580, 594, 72 S.Ct. 512, 521, 96 L.Ed. 586 (1952) (footnote omitted) (deportation for activity legal at time commission not within *ex post facto* clause).

Petition denied.

---

national community and were not regarded as aliens.

\* \* \* \* \* \*

In the early years of the Twentieth Century, the distinction between citizens and noncitizen nationals was an important one. Many of our insular possessions were not regarded as fully incorporated into the United States and their inhabitants were not accorded full rights of citizenship. With the grant of independence to the Philippines, and the gradual extension of citizenship rights to the indigenous inhabitants of other insular possessions, the distinction between citizenship and noncitizen nationality has become less significant.