Vladimir **SHEKOYAN**, Plaintiff,

v.

**SIBLEY INTERNATIONAL CORP.**, Defendant.

**Civil Action No. 00–2519(RBW).**

United States District Court,
District of Columbia.

Aug. 16, 2002.

Dawn V. Martin, Esquire, Washington, DC, for Plaintiff.

Melody A. Rosenberry, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Reston, VA, for Defendant.

### MEMORANDUM OPINION

WALTON, District Judge.

This matter comes before the Court upon Defendant Sibley International Corporation's ("Sibley") Motion to Dismiss the plaintiff's Complaint that alleges (1) discrimination on the basis of national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e), *et seq.* (2000); (2) discrimination on the basis of national origin in violation of Presidential Executive Order ("E.O.") 11,246, Exec. Order No. 11,246, 30 Fed.Reg. 12,319 (Sept. 24, 1965); (3) retaliatory termination of his employment in violation of the whistle-blower provision of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h) (2000); (4) discrimination on the basis of national origin in violation of the District of Columbia

Human Rights Act ("DCHRA"), D.C.Code §§ 2–1401.1–1403.17 (2001); and District of Columbia common law claims of (5) breach of contract; (6) defamation; and (7) intentional infliction of emotional distress. Compl. ¶¶ 1–3. Specifically, the defendant seeks dismissal of the plaintiff's Title VII, E.O. 11,246, and common law claims [1] pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction and the plaintiff's FCA claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(1), 12(b)(6). Upon consideration of the parties' submissions and for the reasons set forth below, the Court must grant the defendant's motion to dismiss the plaintiff's Title VII and Executive Order 11,246 claims, and deny the defendant's motion to dismiss the plaintiff's False Claims Act and state law claims.[2]

## I. *Background*

A brief recitation of the facts that underlie the filing of this case is a necessary prelude to the Court's analysis of the legal arguments raised in the parties' pleadings. The plaintiff asserts that he is an "Armenian-born permanent legal resident of the United States." Compl. ¶ 5. In January 1998, the defendant hired the plaintiff to be a training advisor for a project that would be performed in the Republic of Georgia. *Id.* ¶¶ 10, 17. The plaintiff was hired by, trained at, and reported to the defendant's corporate headquarters in the District of Columbia. *Id.* ¶¶ 13–16. The plaintiff's primary workstation, however, was located in the Republic of Georgia. *Id.* Ex. C. Because the defendant received funding for the project from the United States Agency for International Development ("USAID"),[3] the plaintiff's employment agreement was subject to the policies and regulations of USAID and listed the termination date of the USAID contract as the anticipated date for the termination of his employment contract. *Id.* ¶ 11, Ex. C. The plaintiff contends that his immediate supervisor at the Republic of Georgia job site created a hostile work environment when he discriminated against the plaintiff because of the plaintiff's national origin. *Id.* ¶ 27. The plaintiff also asserts that he informed management officials at Sibley about the alleged discrimination, that he reported the misappropriation of USAID funds by his immediate supervisor to management officials at the defendant's headquarters in Washington, D.C., and that he was advised by those officials not to "make too much noise" about the misuse of funds. *Id.* ¶¶ 54, 68.

When USAID decided to extend its contract with the defendant, the defendant chose not to extend the plaintiff's employment agreement beyond the originally anticipated termination date. *Id.* ¶ 61, Ex. D. The plaintiff asserts that his immediate supervisor sent an electronic (e-mail) message to project employees stating that the plaintiff's employment had been terminated because he "does not follow ... instructions and does not recognize his [supervi-

---

1. The plaintiff's DCHRA, breach of contract, defamation, and intentional infliction of emotional distress claims are collectively referred to as the "state law claims."

2. In connection with this motion, the Court has reviewed the following pleadings and filings: (1) the Complaint ("Compl."); (2) Defendant Sibley's Motion to Dismiss; (3) the Memorandum of Points and Authorities in

Support of Defendant Sibley's Motion to Dismiss ("Def.'s Mem."); (4) Plaintiff's Opposition to Defendant's Motion to Dismiss ("Pl.'s Opp'n"); and (5) Defendant's Memorandum of Point and Authorities in Reply to Plaintiff's Opposition to the Motion to Dismiss.

3. The USAID is a subdivision of the United States Department of State. Pl.'s Opp'n at 1.

sor's] authority." *Id.* ¶ 64. The defendant contends that the USAID extension required a change in staffing requirements, *id.* ex. D, and that the plaintiff did not have the skills required by USAID for the extension. Def.'s Mem. at 2. In his Complaint, however, the plaintiff contends that both the defendant and the Republic of Georgia praised him for his work on the project. Compl. ¶ 23. Following the termination of his employment, the plaintiff filed his *pro se* Complaint.[4]

## II. *Standards of Review*

### (A) *Rule 12(b)(1)*

Federal Rule of Civil Procedure 12(b)(1) requires that the plaintiff bear the burden of establishing by a preponderance of the evidence that the court has jurisdiction to entertain his claims. Fed.R.Civ.P. 12(b)(1); *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F.Supp.2d 9, 13 (D.D.C.2001) (holding that the court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."); *Pitney Bowes, Inc. v. United States Postal Serv.*, 27 F.Supp.2d 15, 18 (D.D.C.1998); *Darden v. United States*, 18 Cl.Ct. 855, 859 (Cl.Ct.1989). While the Court must accept as true all the factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1), *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), because the plaintiff has the burden of proof to establish jurisdiction, the " 'plaintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." *Grand Lodge of Fraternal Order of Police*, 185

F.Supp.2d at 13–14 (citation omitted). However, in deciding a 12(b)(1) motion, the Court is not limited to the allegations in the complaint but may consider " 'such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction in the case.' " *Id.* at 14 (citations omitted).

### (B) *Rule 12(b)(6)*

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), the allegations and facts in the complaint are to be construed in the plaintiff's favor, and the Court must grant the plaintiff the benefit of all inferences that can be derived from the alleged facts. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994). The Federal Rules only require that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), because the complaint "must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, ——, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002) (quoting *Conley*, 355 U.S. at 47, 78 S.Ct. 99). In deciding whether to dismiss a complaint under Rule 12(b)(6), the Court will consider the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters about which the Court may take judicial notice. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C.Cir.1997); *Phillips v. Bureau of Prisons*, 591 F.2d 966, 969 (D.C.Cir.1979). While this theory of "notice pleading" gen-

---

**4.** The plaintiff has subsequently retained counsel, but an amended complaint has not been filed.

erally applies to all civil actions, because the plaintiff's FCA claim is an allegation of fraud, it must also comply with Federal Rule of Civil Procedure 9(b). *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 544 (D.C.Cir.2002). Rule 9(b) "provides for greater particularity in all averments of fraud or mistake," to accomplish the goal of 'fair notice' to the defendant. *Swierkiewicz*, 122 S.Ct. at 998.

However, as the plaintiff filed a *pro se* complaint, the Court must hold the complaint "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 521, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Therefore, even when a claim of fraud is pled, this Court will "read [a] *pro se* complaint[ ] liberally and broadly" and will only dismiss the *pro se* complaint for failure to state a claim upon which relief can be granted if "it appears beyond doubt that the plaintiff can 'prove no set of facts in support of his claim that would entitle him to relief.'" *Id.; see Price v. Phoenix Home Life Ins., Co.*, 44 F.Supp.2d 28, 31 (D.D.C.1999). Nonetheless, some degree of particularity regarding a claim of fraud must be pled even by a *pro se* litigant to satisfy Rule 9(b). *Floyd v. Brown & Williamson Tobacco Corp.*, 159 F.Supp.2d 823, 832 (E.D.Pa. 2001) ("While plaintiff is proceeding *pro se,* and his pleadings must be construed liberally, plaintiff is not relieved of the requirements of Rule 9(b).").

### III. *Analysis*

#### (A) *Plaintiff's Title VII Claim*

■ Title VII of the Civil Rights Act of 1964 was enacted by Congress to "assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To accomplish these goals, Congress mandated that

> [i]t shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a)(1). Prior to the enactment of the Civil Rights Act of 1991, federal courts limited their interpretation of the scope of Title VII's reach, extending its protections only domestically, to both American citizens and aliens working in the United States. *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (Court held that Title VII does not have an extraterritorial application to the employment of American citizens abroad by United States firms), *superceded by* Civil Rights Act of 1991, Pub.L. No. 102–166, § 109(a) (1991) (codified as amended at 42 U.S.C. § 2000e(f)) (1991 amendments to Title VII did not overrule Supreme Court's determination that Title VII is inapplicable to aliens employed outside the United States); *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 95, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973) (holding that Title VII covers aliens employed in the United States). In light of the Supreme Court's decision in *Arabian Am. Oil* rejecting an extraterritorial application of Title VII to American citizens employed abroad by United States companies, Congress enacted the Civil Rights Act of 1991 and amended Title VII to give the statute limited extraterritorial reach. *United States v. Wilkinson*, 169 F.3d 1236, 1238 (10th Cir.1999) (recognizing that *Arabian Am. Oil* was superceded by statute); *Arno v. Club Med Inc.*, 22 F.3d 1464, 1472 (9th Cir.1994) ("In *Arabian Am. Oil* (citation

omitted) the Court held that an employer is not liable under Title VII for employment discrimination that occurs outside of the United States. Though Congress changed that law in the Civil Rights Act of 1991 . . ."); *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 15 (D.D.C.1998) (recognizing that *Arabian Am. Oil* was superceded by statute); *Iwata v. Stryker Corp.*, 59 F.Supp.2d 600, 603–04 (N.D.Tex. 1999) (noting that the Court's decision in *Arabian Am. Oil* held that employers were not liable under Title VII for discrimination against United States citizens occurring outside of the United States. "However, by year's end, Congress ostensibly declared its contrary legislative intent with the enactment of the Civil Rights Act of 1991."). First, the amended Act expands Title VII's definition of "employee" to include United States citizens employed abroad. 42 U.S.C. § 2000e(f) ("With respect to employment in a foreign county, such term [employee] includes an individual who is a citizen of the United States."). Second, Congress explicitly precluded Title VII's extraterritorial scope from covering aliens. 42 U.S.C. § 2000e–1 ("This subchapter shall not apply to an employer with respect to the employment of aliens outside any State . . . .").[5] Finally, this amended language extended Title VII abroad only to corporations controlled by United States employers. 42 U.S.C. § 2000e–1(c).

### (1) *Limitations of the Extraterritorial Reach of Title VII*

 Although the plaintiff claims that he is a United States national, and not an alien, and therefore is protected by Title VII, it is clear from this Court's discussion above that Congress has provided that Title VII will only have an extraterritorial

application when: (1) the employee is a United States citizen and (2) the employee's company is controlled by an American employer. *Iwata*, 59 F.Supp.2d at 604. While Congress certainly "has the authority to enforce its laws beyond the territorial boundaries of the United States", there must be evidence of its intent to do so in the plain language of the statute. *Arabian Am. Oil*, 499 U.S. at 248, 111 S.Ct. 1227 (citing *Foley Bros. v. Filardo*, 336 U.S. 281, 284–85, 69 S.Ct. 575, 93 L.Ed. 680 (1949); *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 147, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957)). It is a general principle that

> [b]ecause statutory language represents the clearest indication of Congressional intent, . . . [this Court] must presume that Congress meant precisely what it said. Extremely strong, this presumption is rebuttable only in the "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters."

*NPR v. FCC*, 254 F.3d 226, 230 (D.C.Cir. 2001) (quoting *United States v. Ron Pair Enterp., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), and citing *Qi–Zhuo v. Meissner*, 70 F.3d 136, 140 (D.C.Cir.1995) ("Where . . . the plain language of the statute is clear, the court generally will not inquire further into its meaning.")). An examination of the plain language of the Civil Rights Act of 1991 demonstrates that Title VII will only apply extraterritorially to United States citizens. Title VII's definition of "employee" was specifically amended to reflect that "[w]ith respect to employment in a foreign county, such term [employee] includes an individu-

---

**5.** Title VII's definition of 'State' includes "a State of the United States, [and] the District of Columbia . . ." 42 U.S.C. § 2000e(i).

al who is a citizen of the United States." 42 U.S.C. § 2000e(f). If Congress had intended to extend Title VII's scope to protect non-United States citizens working abroad for American controlled companies, it could very well have included such individuals in its definition of employee. *See Iwata,* 59 F.Supp.2d at 604 (holding that if Congress intended for Title VII to extend to foreign nationals working outside of the United States, it had the opportunity to do so). While Congress did not explicitly address the extraterritorial reach of Title VII to non-citizen United States nationals in the Civil Rights Act of 1991,[6] Congress was abundantly clear that Title VII's protections would not be extended abroad to aliens. 42 U.S.C. § 2000e-1 ("This subchapter shall not apply to an employer with respect to the employment of aliens outside any State . . . ."); *see Arabian Am. Oil,* 499 U.S. at 246, 111 S.Ct. 1227; *Mota v. Univ. of Tex. Houston Health Sci. Ctr.,* 261 F.3d 512, 524 n. 34 (5th Cir.2001); *Mithani v. Lehman Bros.,* No. 01 CIV 5927, 2002 WL 14359, at *1 (S.D.N.Y. Jan. 4, 2002); *Iwata,* 59 F.Supp.2d at 604. Since Title VII's reach does not extend to non-United States citizens employed outside of the United States, the Court must address (1) the plaintiff's immigration status and (2) the location of his employment.

### (a) *Plaintiff's Immigration Status*

■ While the plaintiff, an Armenian-born permanent legal resident of the United States, attempts to circumvent Title VII's explicit exclusion of aliens by asserting that he is a non-citizen United States national, the Court finds that he is subject to Title VII's explicit alien exemption.[7] Although the plaintiff bears the burden of

establishing by a preponderance of the evidence that this court has jurisdiction to entertain his claims, Fed.R.Civ.P. 12(b)(1); *Grand Lodge of Fraternal Order of Police,* 185 F.Supp.2d at 13; *Pitney Bowes,* 27 F.Supp.2d at 18; *Darden,* 18 Cl.Ct. at 859, and therefore that he should be considered a United States national, the plaintiff simply asserts that the defendant characterized him as a United States national for purposes of its contract with USAID, and that he was subject to the laws of the United States as a result of the residence he maintained in the United States. Pl.'s Opp'n at 11–13. However, plaintiff's bald assertion on these points are not sufficient to prove that he is a United States national.

A non-citizen United States national is a fairly constricted category. Several federal courts that have addressed the definition of the term "national" recognize that it "came into popular use in this country when the United States acquired territories outside its continental limits, and was used in reference to noncitizen inhabitants of those territories." *Rabang v. INS,* 35 F.3d 1449, 1452 n. 5 (9th Cir.1994) (citing 4 Charles Gordon and Stanley Mailman, *Immigration Law and Procedure,* § 91.01[3][b], at 91–5 (1993)); *see United States v. Sotelo,* 109 F.3d 1446, 1448 (9th Cir.1997); *Oliver v. United States Dep't of Justice,* 517 F.2d 426, 428 n. 3 (2d Cir. 1975). The Immigration and Nationality Act defines a "national of the United States [as] (A) a citizen of the United States, or (B) a person, who, though not a citizen of the United States, owes permanent allegiance to the United States." 8 U.S.C. § 1101(a)(22) (2000). Therefore,

---

**6.** That Congress did not address non-citizen United States nationals in the Civil Rights Act of 1991 is not surprising because of the extremely constricted nature of those who qualify as nationals, as fully set forth below.

**7.** Because the plaintiff is an alien, the Court need not address the issue of Title VII's applicability to non-citizen United States nationals who are employed abroad.

because the plaintiff claims that he is non-citizen United States national, this Court must determine whether the plaintiff has offered any proof indicating that he "owes permanent allegiance to the United States." *Id.*

The Second Circuit in *Oliver*, determined that a Canadian citizen who was a twenty-year permanent resident of the United States and who had married an American citizen was not a national because the court found that she had failed to begin the naturalization process and was therefore deemed to still owe allegiance to Canada. 517 F.2d at 427–28. The Eighth Circuit in *Carreon–Hernandez v. Levi*, 543 F.2d 637 (8th Cir.1976), relying on *Oliver*, found a Mexican citizen who was a twenty-year permanent resident of the United States, married to an American citizen, and living "an exemplary life, working, paying taxes, registering for the Selective Service, etc." not a national because he "never applied for United States citizenship." *Id.* The Ninth Circuit, relying on both *Oliver* and *Carreon–Hernandez*, concluded that an individual born outside of the United States, or one of its territories, must, at a minimum, demonstrate that he or she applied for United States citizenship. *Hughes v. Ashcroft*, 255 F.3d 752, 756–57. Thus, courts have found an application for citizenship to be "the most compelling evidence of permanent allegiance to the United States short of citizenship itself." *United States v. Morin*, 80 F.3d 124, 126 (4th Cir.1996). In light of this minimal requirement of an application for citizenship to qualify as a United States national and the plaintiff's failure to show that he has submitted such an application, the Court must find that the plaintiff has failed to establish by a preponderance of the evidence that he is a United States national. The plaintiff has simply stated that "[a] person who is not a citizen of the United States may apply to the Secretary of State for a certificate stating that he/she is an 'American national' for judicial or administrative proceedings abroad. 8 U.S.C. § 1502." Pl.'s Opp'n at 10. However, the plaintiff has not provided the Court with any evidence that he has attained such a certificate. Therefore, this Court concludes that the plaintiff is considered an alien pursuant to 8 U.S.C. § 1101(a)(3) ("The term 'alien' means any person not a citizen or national of the United States"). Thus, Title VII's scope will not extend its protections to the plaintiff if his primary workstation is considered extraterritorial.

### (2) *Location of Plaintiff's Employment*

█ The plaintiff also asserts that Title VII's protections apply because the defendant "recruited, interviewed, hired, and trained Plaintiff" and made its decisions regarding his employment status in the United States. Pl.'s Opp'n at 22. The location of the alleged discriminatory employment of a non-citizen is critical to a Title VII analysis because, as discussed above, this remedial statute only extends to the boundaries of the United States. Left with the question of the location of the plaintiff's employment, this Court finds relevant, in its analysis of the scope of Title VII, 42 U.S.C. § 2000e(f), the conclusions of courts that have addressed the extraterritorial limits of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 630(f) (1999). *Mithani*, 2002 WL 14359, at *1; *Iwata*, 59 F.Supp.2d at 604; *Gantchar v. United Airlines, Inc.*, 1995 WL 137053, at *6 (N.D.Ill. Mar.28, 1995); *Akgun v. Boeing Co.*, 1990 WL 112609, at *4 (W.D.Wash. June 7, 1990) (holding that ADEA and Title VII have similar legislative goals and the 1984 amendment to the ADEA was designed to extend coverage to United States citizens abroad to bring it

into conformity with Title VII). The Court finds particularly noteworthy that Title VII and the ADEA's "provisions defining 'employee' and outlining foreign employment are virtually identical", *Iwata*, 59 F.Supp.2d at 604, as both are limited in their extraterritorial application to: (1) United States citizens and (2) employers controlled by an American company. *Compare* 42 U.S.C. § 2000e(f) ("With respect to employment in a foreign country, [employee] includes an individual who is a citizen of the United States."), *with* its ADEA counterpart, 29 U.S.C. § 630(f) (1999) ("The term 'employee' includes any individual who is a citizen of the United States employed by an employer in a workplace in a foreign country."); *see Denty v. Smithkline Beecham Corp.*, 109 F.3d 147, 150 (3rd Cir.1997) (defining the 1984 extraterritorial amendments to the ADEA).

■ A determination of a plaintiff's location of employment for both Title VII and ADEA purposes focuses on the location of the employee's primary workstation. *Denty*, 109 F.3d at 150 (court determined that the work site was abroad although employment decisions were made within the United States); *Pfeiffer v. W.M. Wrigley Jr., Co.*, 755 F.2d 554 (7th Cir.1985) (plaintiff was company's director abroad and therefore court held that his place of employment was abroad); *Iwata*, 59 F.Supp.2d at 603–04 (non-citizen's work was performed abroad); *Hu v. Skadden, Arps, Slate, Meagher & Flom, LLP*, 76 F.Supp.2d 476, 477 (S.D.N.Y. 1999) (court found fact that defendant conducted interviews and may have made hiring decisions in United States did not render employment in the United States because the work non-citizen plaintiff was to perform was abroad); *O'Loughlin v. Pritchard Corp.*, 972 F.Supp. 1352, 1363–64 (D.Kan.1997) (court found that non-citi-

zen plaintiff's employment was abroad even though he was hired in the United States and did some of his training in the United States); *Gantchar*, 1995 WL 137053, at *6; *Wolf v. J.I. Case Co.*, 617 F.Supp. 858, 863 (E.D.Wis.1985) (holding that plaintiff's employment was abroad where he performed his duties outside of the United States, but made numerous business trips to the United States). Courts have been consistently clear that an individual, whose primary workstation is abroad, cannot characterize otherwise extraterritorial employment as domestic solely because employment decisions were made and the training occurred for such jobs in the United States. *Denty*, 109 F.3d at 150; *Pfeiffer*, 755 F.2d at 555; *Hu*, 76 F.Supp.2d at 477; *Gantchar*, 1995 WL 137053, at *6; *O'Loughlin*, 972 F.Supp. at 1363–64. In this case, the Court must conclude that the plaintiff's primary workstation, and thus his place of employment, was located outside the United States, in the Republic of Georgia, throughout his employment with the defendant. Compl. ¶ 21, Ex. C. This is evidenced by the fact that the plaintiff was specifically hired by the defendant to work in the Republic of Georgia and performed his primary work related duties there. Def.'s Mot. Ex. 2. Under such circumstances in which the plaintiff does not dispute that his employment was located in the Republic of Georgia, but instead claims that Title VII's protections apply because employment decisions and training occurred in the United States, this Court, as have other courts, must find that the plaintiff's primary workstation was extraterritorial.

In sum, because the Court finds that the plaintiff is a permanent resident alien, who was employed extraterritorially, he is outside the scope of the protections of Title VII. The Court therefore lacks subject matter jurisdiction over the plaintiff's Title

VII discrimination claim and must grant defendant's motion to dismiss the Title VII claim pursuant to Federal Rule of Civil Procedure 12(b)(1).

## (B) *Executive Order 11,246 Claim*

 Executive Order 11,246 "establishes a program to eliminate employment discrimination by the Federal Government and by those who benefit from Government contracts." *Chrysler Corp. v. Brown,* 441 U.S. 281, 304, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979); 30 Fed.Reg. 12,319 (1965). While the plaintiff has filed a claim under Executive Order 11,246, this Court, however, as a threshold matter must first determine whether it has jurisdiction to entertain the claim. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). As the Supreme Court stated in *Ex Parte McCardle,* 74 U.S. 506, 7 Wall. 506, 514, 19 L.Ed. 264 (1868),

> [w]ithout jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause. And this

is not less clear upon authority than upon principle.

This Court is conferred jurisdiction over "federal questions" pursuant to 28 U.S.C. § 1331 (2000), which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." While federal courts have determined that some executive orders have the force of law, and therefore controversies regarding them "arise[ ] under ... laws ... of the United States," the question that must be first resolved is " 'whether or to what extent Congress did grant ... such authority' to the executive branch of the government."[8] *Liberty Mut. Ins. Co. v. Friedman,* 639 F.2d 164, 168 (4th Cir.1981). The "origins of congressional authority for Executive Order 11,246 are somewhat obscure and have been roundly debated by commentators and courts." *Chrysler Corp.,* 441 U.S. at 304, 99 S.Ct. 1705. However, this Court, like the Supreme Court in *Chrysler Corp.,* notes that it is not necessary to decide what legislative grant authorized the President to issue Executive Order 11,246, because even if this Executive Order was authorized pursuant to a valid grant of legislative authority,[9] there is no private cause of

8. This Court is reminded of Justice Jackson's analysis in *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 634–55, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), when he discussed judicial review of claims that the President has unconstitutionally exceeded his authority:

 1. When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right, plus all that Congress can delegate. In these circumstances, and in these only, may he be said (for what it may be worth) to personify the federal sovereignty ...
 2. When the President acts in the absence of either a congressional grant or denial of authority he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may

 have concurrent authority, or in which its distribution is uncertain. Therefore, congressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures on independent presidential responsibility. In this area, any actual test of power is likely to depend on the imperatives of events and contemporary imponderables rather than on abstract theories of law.
 3. When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers, minus any constitutional powers of Congress over the matter.

9. The Supreme Court in *Chrysler Corp.* noted that there has been a wide array of debate over whether Executive Order 11,246 was

action available to the plaintiff. An examination of Executive Order 11,246 reveals that it is devoid of a provision that provides for a private cause of action against a non-complying contractor. 30 Fed.Reg. 12,319 (1965); *see Women's Equity Action League v. Cavazos*, 906 F.2d 742, 750 (D.C.Cir.1990) (citing *Utley v. Varian Assocs.*, 811 F.2d 1279, 1285–86 & n. 4 (9th Cir.), *cert. denied*, 484 U.S. 824, 108 S.Ct. 89, 98 L.Ed.2d 50 (1987)); *Brug v. Nat'l Coalition for the Homeless*, 45 F.Supp.2d 33, 41 (D.D.C.1999).[10] Instead, the Order provides for enforcement by the Department of Labor, to which the President's authority to investigate non-compliance and pursue criminal and/or civil proceedings is delegated. *Id.* The Third Circuit has commented that:

> [t]he history of the executive orders on the subject [of nondiscrimination in Government contracts] from 1951 to the present all point to the conclusion that the enforcement of the nondiscrimina-

tion provisions in Government contracts has been entrusted to one or more of the Governmental agencies with the assistance of a committee appointed by the President.

*Farmer v. Philadelphia Elec. Co.*, 329 F.2d 3, 8 (3rd Cir.1964); *see Farkas v. Texas Instrument, Inc.*, 375 F.2d 629, 632 (5th Cir.1967). Therefore, because it is clear that Executive Order 11,246 does not provide for a private cause of action, the plaintiff's claim filed pursuant to it must be dismissed.

(C) *The "Whistleblower Provision" of the False Claims Act*

The FCA, 31 U.S.C. §§ 3729–3733 (2000), was originally enacted in 1863 following "congressional investigations into the sale of provisions and munitions to the War Department" during the Civil War. *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 183 (3rd Cir.2001) (citations omitted). "Testimony before Congress

---

promulgated pursuant to legislative authority granted in: the Federal Property and Administrative Services Act of 1949, 40 U.S.C. § 471; Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d–4, 2000e to 2000e–17; the Equal Employment Opportunity Act of 1972; and 5 U.S.C. § 301 or commonly referred to as the "housekeeping statute". *Id.* at 304–08, 99 S.Ct. 1705; *see U.S. v. Trucking Mgmt., Inc.*, 662 F.2d 36, 43–45 (D.C.Cir.1981) (affirming trial court decision that Congress did not intend to permit E.O. 11,246 to override bona fide, neutral seniority systems); *United States v. Miss. Power & Light Co.*, 638 F.2d 899, 905 (5th Cir. 1981) (holding that E.O. 11,246 is firmly rooted in congressionally delegated authority); *United States v. New Orleans Pub. Service Inc.*, 553 F.2d 459, 467–68 (5th Cir.1977) (identifying three sources of legislative authorization for E.O. 11,246), *vacated on other grounds by* 436 U.S. 942, 98 S.Ct. 2841, 56 L.Ed.2d 783 (1978); *Farmer v. Philadelphia Elec. Co.*, 329 F.2d 3 (3d Cir.1964) (suggesting that the Federal Property and Administrative Services Act of 1949 ("FPASA") was the authority for predecessors of E.O. 11,246), *cert. denied*, 389

U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967); *Contractors Ass'n E. Pa. v. Secretary of Labor*, 442 F.2d 159, 174–75 (3d Cir.1971) (holding that E.O. 11,246 is authorized by the broad grant of procurement authority with respect to Titles 40 and 41); *Farkas v. Tex. Instrument, Inc.*, 375 F.2d 629 (5th Cir.1967) (holding generally that Congress granted the President the necessary authority to enact anti-discrimination executive orders under the FPASA); *S. Ill. Builders Ass'n v. Ogilvie*, 327 F.Supp. 1154, 1161 (S.D.Ill.1971) (assuming that E.O. 11,246 is properly rooted in congressionally delegated authority); *but see Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 170–73 (4th Cir.1981) (invalidating agency regulation under E.O. 11,246 because no statutory grant of congressional authority).

**10.** Moreover, courts have also rejected third-party beneficiary claims pursuant to agreements between the government and contractors as an attempt to circumvent the lack of a private cause of action in Executive Order 11,246. *Brug*, 45 F.Supp.2d at 41 (citations omitted).

painted a sordid picture of how the United States had been billed for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war." *Id.* What became known as the "Lincoln Law," the FCA is a unique statute in that, in addition to it allowing the government to bring a civil action against an alleged false claimant, the FCA also contains a *qui tam* provision.[11] *Vermont Agency,* 529 U.S. at 768–70, 120 S.Ct. 1858. A *qui tam* action provides that an individual (known as a relator) may bring a cause of action both on that person's behalf and on behalf of the government, thereby allowing the relator to share a portion of the proceeds derived from the recovery in a case. *Id.* In response to concerns that alleged false claimants were taking adverse employment actions against employees who had made allegations of fraudulent conduct related to the misuse of government funds, Congress amended the FCA in 1986 and added to the Act Section 3730(h), which is known as the whistleblower provision. *United States ex rel. Yesudian v. Howard Univ.,* 153 F.3d 731, 736 (D.C.Cir.1998). Section 3730(h) provides that:

> "[a]ny employee who is discharged, demoted, suspended, threatened, harassed, or in any manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all

relief necessary to make the employee whole . . ."

31 U.S.C. § 3730(h). The District of Columbia Circuit has stated that to make out a successful claim of retaliation under Section 3730(h), a plaintiff must demonstrate:

> (1) he engaged in protected activity, that is, 'acts done . . . in furtherance of an action under this section'; and (2) he was discriminated against 'because of' that activity. To establish the second element, the employee must in turn make two further showings. The employee must show that: (a) 'the employer had knowledge the employee was engaged in protected activity'; and (b) 'the retaliation was motivated, at least in part, by the employee's engaging in [that] protected activity.'

*Yesudian,* 153 F.3d at 736 (quoting S.Rep. No. 99–345, at 35, reprinted in 1986 U.S.C.C.A.N. at 5300).

In the instant case, the plaintiff asserts that he "reported to his superiors in Sibley's Washington, D.C. office numerous illegal uses of United States government funds, equipment and materials by individual employees of Sibley International in Georgia . . . [and] was specifically asked by Sibley officials to 'keep it quiet' until the contract with USAID was renewed." Pl.'s Opp'n at 26. The plaintiff's contract was subsequently not renewed once the defendant's contract with USAID was renewed. *Id.* This Court has subject-matter jurisdiction to entertain the plaintiff's FCA claim because the plaintiff's alle-

---

**11.** *Qui tam* is short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur. Vermont Agency of Natural Res. v. United States ex rel. Stevens,* 529 U.S. 765, 769 n. 1, 120 S.Ct. 1858, 146 L.Ed.2d 836. This English translation of this phrase means he "who pursues this action on our Lord the King's behalf as well as his own." *Id.* There are three other *qui tam* statutes that

remain in the United States Code: 25 U.S.C. § 81 (cause of action and share of recovery against a person contracting with Indians in an unlawful manner); 25 U.S.C. § 201 (cause of action and share of recovery against a person violating Indian protection laws); 35 U.S.C. § 292(b) (cause of action and share of recovery against a person falsely marking patented articles). *Id.*

gations, if proven true, demonstrate that the crux of the inappropriate conduct occurred within the United States. As the nature of the protection offered by the whistleblower provision of the FCA is to remedy retaliation for a false claims disclosure, it is noteworthy that the plaintiff allegedly notified Sibley's officials in Washington, D.C. of the fraudulent misappropriation of United States government funds by its' employees in the Republic of Georgia, the officials informed him to "keep it quite", and he was subsequently terminated when his contract with the de-

fendant was not renewed.[12] *See* 31 U.S.C. § 3729(a) (2000).[13] This conduct regarding the plaintiff's FCA claim is distinguishable from the conduct complained about in the plaintiff's Title VII claim because the genesis of the FCA whistleblower claim is the disclosure of the misappropriation of government funds and the subsequent retaliation for such disclosure, conduct that occurred within the United States, whereas the plaintiff's Title VII claim involves discrimination at the workplace, conduct that occurred abroad.[14] Therefore, because the Court finds that it has subject-matter jur-

---

**12.** The termination of the plaintiff's employment appears to have been initiated in the United States, as evidenced by the termination letter from the defendant's Chief Financial Officer who works at the defendant's main office in Washington, D.C. *See* Compl. Ex. D.

**13.** 31 U.S.C. § 3729(a) states that an individual is liable under the FCA for committing the following acts:

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

(4) has possession, custody, or control of property or money used, or to be used, by the Government and, intending to defraud the Government or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt;

(5) authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6) knowingly buys, or receives as a pledge of an obligation or debt, public property

from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge the property; or

(7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

**14.** Although it appears to the Court that the whistleblower provision of the FCA may not apply to aliens and fraudulent conduct that occurs abroad, this issue is not before the Court because the conduct at issue in the plaintiff's FCA allegation occurred within the United States. As the Court discussed above in reference to Title VII, courts must only construe a statute's scope to extend domestically, unless there is clear language by Congress in the statute to extend the statute's protections abroad. *See Arabian Am. Oil*, 499 U.S. at 248, 111 S.Ct. 1227; *Foley Bros.*, 336 U.S. at 284–85, 69 S.Ct. 575; *Benz*, 353 U.S. at 147, 77 S.Ct. 699; *but see, United States ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd.*, 110 F.3d 861 (2d Cir.1997) (Second Circuit held that district court had subject-matter jurisdiction in *qui tam* FCA suit involving British plaintiffs and a British defendant company, which had a number of contracts with a contractor to the United States Air Force. The Second Circuit held that Section 3732(a) ("False claims jurisdiction") is a venue statute and found ("no basis in the evolution of § 3732(a) or in the legislative history of its enactment for reading into that section a limitation on the district court's subject matter jurisdiction.")). *Id.* at 868.

isdiction to entertain the plaintiff's FCA claim, it will examine the adequacy of the plaintiff's FCA allegation because the defendant asserts that the plaintiff "has not alleged any facts which even suggest that Sibley submitted a false claim to the government ...", Def.'s Mot. at 8, and has therefore failed to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).[15]

### (1) *Adequacy of the False Claim Act Allegations in the Plaintiff's Complaint*

 To sufficiently plead a whistleblower retaliation claim under the FCA, the plaintiff must assert that he was engaged in "protected activity" either by alleging that he investigated false or fraudulent claims made by the defendant to USAID or by alleging that he reported such claims to the defendant or USAID. 31 U.S.C. § 3730(h); *Yesudian,* 153 F.3d at 737. The District of Columbia Circuit has stated that an allegation brought under the FCA must satisfy the requirements of Federal Rule of Civil Procedure 9(b). *Totten,* 286 F.3d at 544, 551–52. Rule 9(b) mandates that fraud claims be pled with particularity, and the rule was designed to discourage meritless fraud accusations, to prevent serious damage to the reputation of the defending party from baseless claims, and to deter claimants from adding broad fraud allegations to induce advantageous settlements. *Firestone v. Firestone,* 76 F.3d 1205, 1211 (D.C.Cir. 1996); *Shields v. Washington Bancorp.,* 1992 WL 88004, at *4 (D.D.C. April 7, 1992). The specific allegations required under Rule 9(b) may differ depending on the facts of each case, however, a claimant must typically allege the identity of the person who made the fraudulent statement, the time, place and content of the misrepresentation, the resulting injury, and the method by which the misrepresentation was communicated. *Totten,* 286 F.3d at 552; *Firestone,* 76 F.3d at 1211; *Kowal,* 16 F.3d at 1278. Conclusory allegations that a defendant's actions were fraudulent and deceptive are not sufficient to satisfy Rule 9(b). *Shields,* 1992 WL 88004, at *4; *Greenstone v. Cambex Corp.,* 975 F.2d 22, 25 (1st Cir.1992).

 The plaintiff's *pro se* Complaint, even when held to a less stringent standard than those pleadings drafted by attorneys, fails to satisfy the requirements of Rule 9(b). While the plaintiff alleges that he reported his immediate supervisor's alleged misuse of USAID funds to the defendant, Compl. ¶ 68, he fails to allege the time, place and nature of the misuse, the resulting injury, or the method by which false claims were made with any particularity. However, in the Plaintiff's Opposition to the Defendant's Motion to Dismiss, he does now, with the assistance of counsel, meet the specific pleading requirements with regards to his FCA claim. Pl.'s Opp'n at 28–32. While it is generally understood that the complaint may not be amended by legal memoranda that are submitted as oppositions to motions for dismissal or summary judgment, *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984), courts have allowed, for Rule 9(b) purposes, a party to supplement its complaint through such legal memoranda or to amend its complaint for the sake of judicial economy.

---

15. Moreover, this Court finds that it is an appropriate venue pursuant to 31 U.S.C. § 3732(a), which states that "[a]ny action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred."

Those courts that have allowed a party to supplement a fraud allegation in the complaint with legal memoranda rely on the rationale of judicial economy. For example, in *Bonilla v. Trebol Motors Corp.,* 150 F.3d 77, 81 (1st Cir.1998), the First Circuit treated the plaintiff's summary judgment opposition and related discovery material provided by the plaintiff, which gave sufficient notice of fraudulent acts, as a de facto amendment to the fraud allegation in the complaint. The court noted that this was a "special circumstance[ ] and only for Rule 9(b) purposes" and found that "[a] remand at this stage to allow an amendment to the complaint to restate this information would be silly." *Id.* Furthermore, in *Elias Brothers Restaurants, Inc. v. Acorn Enterprises, Inc.,* 831 F.Supp. 920, 922 n. 3 (D.Mass.1993), the court found that rather than granting leave to amend the complaint, an affidavit submitted in opposition to a summary judgment motion should be considered a supplement to the fraud allegation in the complaint. Similarly, the court in *Buccino v. Continental Assurance Co.,* 578 F.Supp. 1518 (S.D.N.Y.1983), denied the defendant's motion to dismiss a fraud claim finding that specific fraud allegations were "supplied by the documentary, affidavit and deposition evidence produced in connection with [the summary judgment] motion." *Id.* at 1524 n. 5. These courts have concluded that allowing such amendments was fair because, given the allegations contained in the plaintiffs' legal memoranda, the defendants had adequate notice of the specifics of the fraud claims. *Bonilla,* 150 F.3d at 81; *Elias Bros. Rests.,* 831 F.Supp. at 922 n. 3; *Cont'l Assurance,* 578 F.Supp. at 1524 n. 5.[16]

Federal Rule of Civil Procedure 15(a) states that leave to amend pleadings shall be freely given when required by justice. *Firestone,* 76 F.3d at 1209. The District of Columbia Circuit has stated that "leave to amend is 'almost always' allowed to cure deficiencies in pleading fraud." *Id.* (quoting *Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir.1986) (quoting 2A J. Moore & J. Lucas, *Moore's Federal Practice,* ¶ 9.03 at 9–34 (2d ed.1986))). And in *Shields,* 1992 WL 88004, at *4, another judge of this Court recognized that "the trend in most courts is to permit plaintiff an opportunity to amend, as required by the liberal policy permitting amendments under Rule 15." Moreover, in *Wallace v. Abramson,* 1988 WL 63065, at *3 (D.D.C. June 7, 1988), the court permitted the plaintiff to amend his complaint to satisfy Rule 9(b), finding that there was no "undue delay, bad faith or dilatory motive ..., repeated failure to cure deficiencies ..., undue prejudice to the opposing party ..., [or] futility of the amendment."

In his opposition to defendant's dismissed motion, the plaintiff provides specific details regarding both his immediate supervisor's alleged fraudulent use of USAID resources and improper conduct between Sibley and private business interests, both of which allegedly defrauded the United States government. Pl.'s Opp'n at 28–32. Specifically, the plaintiff asserts twenty-two allegations of fraud, including, among other things, the following: that the defendant improperly used USAID funds to generate and perform private business; that the plaintiff's immediate supervisor used USAID project staff during business hours and USAID resources to perform private business matters, such as house renovations, the purchase of person-

---

**16.** While the Court recognizes that the posture of *Bonilla, Elias Bros. Rests.,* and *Cont'l Assurance* when they were before the courts were on motions for summary judgment, the Court does not discern any meaningful reason why a different result is called for when a Rule 9(b) challenge is raised solely in a motion to dismiss.

al items and natural gas; that, at the expense of USAID and for personal reasons, Mr. Reynolds relocated the project offices to more expensive but substandard offices; and, that subcontractor contracts were pre-selected in violation of USAID regulations. Pl.'s Opp'n at 28–32. Such allegations of fraud certainly comport with the specificity requirements of Federal Rule of Civil Procedure 9(b).

Therefore, because of these additional allegations, the Court is unable to "say with assurance that ... it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Haines*, 404 U.S. at 520–21, 92 S.Ct. 594. Accordingly, dismissal of the plaintiff's *pro se* FCA claim is inappropriate because the Court finds that the plaintiff's opposition to the motion to dismiss adequately complies with the pleading requirements of Rule 9(b), and the defendant is now clearly on notice of the particulars of the FCA claim.[17] The Court determines that justice requires that the plaintiff be afforded the opportunity to file an amended complaint because judicial economy is advanced by refusing to dismiss the FCA claim since it is inevitable that counsel would argue that plaintiff should be permitted to refile the FCA claim because a *pro se* complaint should not suffer the harsh consequence of dismissal solely due to the plaintiff's ignorance of the unique pleading requirements applicable to an FCA claim. Therefore, the Court will deny the defendant's motion to dismiss in order to allow plaintiff's counsel the opportunity to file an amended complaint.[18]

### (D) *State Law Claims*

When a federal court has an independent basis for exercising federal jurisdiction, the court may also exercise supplemental jurisdiction over "claims that are so related to claims in the action within original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a) (2001); *Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 920 (D.C.Cir.1996). To be adequately related, the federal and state claims must "derive from a common nucleus of operative fact ... [and] are such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

The plaintiff's federal whistleblower retaliation claim under the FCA and his state statutory claims "derive from a common nucleus of operative fact," namely, the circumstances surrounding Mr. Shekoyan's employment termination. Therefore, the Court can exercise supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367. While federal courts have the discretion to decline to exercise jurisdiction over state claims, the Court concludes that "'considerations of judicial economy, convenience, and fairness to litigants'" favor the several claims being litigated in a single proceeding. *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 349, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) (citations omitted). Thus, the defendant's mo-

**17.** It appears that the defendant may have been on notice of the particulars of the FCA allegations prior to the filing of the complaint. The plaintiff asserts that he sent the defendant a letter seven days prior to initiating suit, specifically "detailing. the facts and the legal basis of each claim ..." Pl.'s Opp'n at 27.

**18.** If an amended complaint is not filed within fifteen (15) days from the date of the issuance of this Order, defendant can renew its motion to dismiss the fraud claim.

tion to dismiss the plaintiff's state law claims on the ground that the Court lacks subject matter jurisdiction over those claims is denied.

## IV. *Conclusion*

For the reasons set forth above, this Court must grant the defendant's motion to dismiss the plaintiff's Title VII claim because he is an alien employed extraterritorially, and his Executive Order 11,246 claim because the executive order does not provide for a private right of action. However, the defendant's motion to dismiss the plaintiff's FCA claim must be denied because the plaintiff's allegations as now set forth in his opposition to the defendant's motion to dismiss comply with the pleading requirements of Rule 9(b). Finally, the plaintiff's state law claims also survive the defendant's dismissal challenge because this Court finds it legally proper to exercise supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367.[19]

## *ORDER*

For the reasons set forth in the Memorandum Opinion accompanying this Order, Defendant's Motion to Dismiss is granted in part and denied in part. Therefore it is,

**ORDERED** that Defendant's Motion to Dismiss the plaintiff's Title VII and Executive Order 11,246 claims is **GRANTED;** and it is

**FURTHER ORDERED** that Defendant's Motion to Dismiss the plaintiff's False Claim Act, District of Columbia Human Rights Act, breach of contract, defamation, and intentional infliction of emotional distress claims is **DENIED;** and it is

**FURTHER ORDERED** that the plaintiff shall file an amended Complaint that conforms to the requirements of Federal

19. An Order consistent with the Court's rul-

Rule of Civil Procedure 9(b) within fifteen (15) days of the entry of this Order.

ing accompanies this Memorandum Opinion.